UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GEORGE BELL,

                             Plaintiff,

    -against-

CITY OF NEW YORK; POLICE OFFICER
LOUIS PIA; POLICE OFFICER RICHARD SICA;
POLICE OFFICER PAUL HEIDER; POLICE
OFFICER FRANK BOVINO; POLICE OFFICER
MARYANN BUBELNIK; POLICE OFFICER
ANDREW CARDAMONE; POLICE OFFICER
DENNIS BROOKS; POLICE OFFICER
WILLIAM NEVINS,

                         Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff George Bell, by his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel

LLP and Scott Stevenson, Esq., alleges as follows:

## PRELIMINARY STATEMENT

1. On June 11, 1999, Plaintiff George Bell was convicted of a double homicide,

including the murder of an off-duty police officer, a crime he did not commit.

2. Mr. Bell was 19 years old at the time of his arrest. Mr. Bell's conviction was

vacated and he was finally freed at the age of 44, having spent over 24 years in prison.

3. Police and prosecutorial misconduct caused this tragedy. The investigation, trial,

and conviction of Mr. Bell were tainted by a coerced confession, the fabrication of evidence, and

the withholding of voluminous *Brady* material that made it clear that a local robbery ring called

"Speedstick"—not Mr. Bell—had committed the crime.

4. Despite the flimsiest of evidence against him and clear evidence pointing to other

suspects, Mr. Bell was charged with *capital murder* for the deaths of Charles Davis, an off-duty

NYPD policeman, and Ira "Mike" Epstein, a Queens businessman, in the failed robbery of Mr. Epstein's check cashing store on December 21, 1996.  For 30 months, he faced the possibility of execution by the state. Mr. Bell is only here today to see himself exonerated because a jury spared his life at the penalty phase of his flawed trial.

5.      Mr. Bell's entire adult life was destroyed by the police and prosecutors.

6.      The state's case against Mr. Bell hinged on a confession obtained by threatening and beating a sleep-deprived and terrified Mr. Bell. Mr. Bell's police interrogators told him he would never see his family again and that he would get the electric chair unless he cooperated. When Mr. Bell proclaimed his innocence, he was brutally beaten. Mr. Bell was threatened with further violence unless he confessed. After hours of physical assaults and psychological terror, Mr. Bell relented to his tormentor's demand that he confess to a crime he did not commit. Mr. Bell repeated the facts the police had fed to him and falsely implicated himself in a double homicide to end his ordeal.

7.      The ordeal, however, did not end as Mr. Bell faced more police and prosecutorial misconduct leading up to and during his trial.

8.      Law enforcement withheld mountains of *Brady* material, as recent investigations have revealed. This exonerating evidence would have proven that members of a local armed robbery gang called Speedstick, not Mr. Bell, had committed the murders.

9.      Based on Mr. Bell's coerced confession and without the exonerating *Brady* material, Mr. Bell was convicted of first-degree murder. He was sentenced to life in prison without parole.

10.      Mr. Bell served over twenty-four years of his sentence before the truth—that his conviction was the result of flagrant misconduct by both police and prosecutors—came to light.

11.     Mr. Bell was finally freed in March 2021 when the Queens District Attorney's Office ("QDAO") asked the state court to vacate Mr. Bell's and his co-defendants' convictions.

12.     The judge who granted Mr. Bell his freedom, Justice Zayas, made no secret of his view that Mr. Bell's conviction was the result of deliberate violation of his constitutional rights.

13.     In granting Mr. Bell's motion to vacate, Justice Zayas castigated law enforcement and found that their handling of Mr. Bell's case "leaves the distinct impression that the suppression of the [exonerating] information was not an isolated instance of misconduct, but part of a larger pattern of behavior that was calculated to deprive the defendants of fair trials, which is particularly egregious given that the death penalty was being sought against 19-year-old George Bell." *People v. Bell*, 71 Misc. 3d 646, 665 (N.Y. Sup. Ct. 2021). Justice Zayas rejected the QDAO's claim that Mr. Bell's false conviction was product of mere "good faith" mistakes: "The extensive record before the Court . . . makes clear that . . . the District Attorney's Office . . . deliberately withheld from the defense credible information of third-party guilt that was in its possession and that had in fact been investigated." *Id.*

14.     Three months after Mr. Bell's conviction was vacated, the QDAO announced it had conducted an "extensive and exhaustive investigation" of the murders at issue, and found no evidence linking Mr. Bell to the crime. The QDAO dismissed all charges against Mr. Bell.

15.     The two Assistant District Attorneys who sought and obtained Mr. Bell's unjust murder conviction—ADAs Brad Leventhal and Charles Testagrossa—have both since resigned in disgrace and may well be disbarred, suspended, or otherwise disciplined for their misconduct in this case.[1]

---

[1] *See* George Joseph, *Prosecutors Wrongfully Convicted Three Men Who Spent 24 Years Behind Bars. Will They Be Disbarred?*, Gothamist,  https://gothamist.com/news/prosecutors-wrongfully-convicted-three-men-who-spent-24-years-behind-bars-will-they-be-disbarred (May 6, 2021) (reporting that a group of law professors have filed official grievances against Leventhal and Testagrossa with the disciplinary committee

16.     Tragically, this egregious prosecutorial misconduct was not an isolated incident. The QDAO's practice—as Justice Zayas found—was to condone prosecutorial misconduct and encourage the regular suppression of *Brady* material.

17.     Mr. Bell suffered indescribable loss and agony as a result of the conduct of the police and the unlawful practices of the City. This lawsuit seeks to compensate Mr. Bell for the prime years of his life he lost as a result of his unjust and wrongful conviction.

## JURISDICTION

18.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331 and 1343 over claims arising under 42 U.S.C. §1983.

19.     Supplemental jurisdiction over Mr. Bell's pendent state law claims exists pursuant to 28 U.S.C. §1367(a).

20.     Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I. Mr. Bell served a notice of claim on the Municipal defendants on July 15, 2021, within the time required by New York General Municipal law Section 50-e. More than 30 days have passed since the service of the Notice of Claim.

21.     On September 15, 2021, Mr. Bell submitted to a hearing pursuant to New York General Municipal law Section 50-h.

22.     Plaintiff demands a trial by jury.

## VENUE

23.     Pursuant to 28 U.S.C. §139l(b), venue is proper in the Eastern District of New York, the judicial district in which multiple Defendants reside,  where the City of New York conducts its business, and in which all events giving rise to the claim took place.

## PARTIES

24.     Plaintiff George Bell is a citizen and resident of the State of New York.

25.     Defendant City of New York ("City") is a municipality that is a political subdivision of the State of New York. The City was the employer of the New York City Police Department ("NYPD") Defendants Louis Pia, Richard Sica, Paul Heider, Frank Bovino, Maryanne Bubelnik, Andrew Cardamone, Dennis Brooks, and William Nevins, and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Queens County District Attorney's Office.

26.     Defendant Louis Pia, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Defendant Pia was assigned as a detective to the 115th Precinct. At all times stated herein Defendant Pia was acting within the scope of his employment.

27.     Defendant Richard Sica, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Defendant Sica was assigned as a detective assigned to the 115th Precinct. At all times stated herein Defendant Sica was acting within the scope of his employment.

28.     Defendant Paul Heider, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Heider was acting within the scope of his employment.

29.     Defendant Frank Bovino, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Bovino was acting within the scope of his employment.

30.     Defendant Maryann Bubelnik at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Bubelnik was acting within the scope of her employment.

31.     Defendant Andrew Cardamone at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Cardamone was acting within the scope of his employment.

32.     Defendant Dennis Brooks at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Brooks was acting within the scope of his employment.

33.     Defendant William Nevins at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. At all times stated herein Defendant Nevins was acting within the scope of his employment.

34.     All Defendants other than the City of New York are collectively referred to as the "Individual Defendants".

## FACTUAL ALLEGATIONS

### Nineteen-Year-Old George Bell

35.     At the time of his arrest, George Bell was an extraordinarily unlikely suspect in a vicious double-homicide.

36.     Mr. Bell was 19 years old and had no criminal record.

37.     Mr. Bell had limited mental capacity. The New York State Department of Education had classified Mr. Bell as "Mildly Mentally Retarded."

38.     At the time of his arrest, Mr. Bell held a stable job as a stock boy at Old Navy. He had taken the exam to join the United States Navy.

39.     He was succeeding with the support of his loving family. Many of these family members testified at the penalty phase of his criminal trial about Mr. Bell's kind and tender nature and his close loving relationship with his parents and his siblings.

40.     One of the QDAO's trial prosecutors, ADA Brad Leventhal, even concurred in this assessment, but perversely used it against Mr. Bell to try to persuade the jury to impose the death penalty, arguing that "It's difficult to imagine a family that could have been more loving or supportive," but that Mr. Bell nonetheless was unredeemable.

41.     None of these facts made the police or the prosecution ever think twice before pursuing his conviction and the death penalty or, when they failed to kill him, sending him to prison for life without the possibility of parole. He was a Black teenager living in a working-class neighborhood, and law enforcement, egged on by a rabid Mayor (Rudolph Giuliani) and the tabloids, was quick to assume he committed this grisly crime. Neither his law-abiding life with

7

his supportive family nor the lack of any physical evidence tying him to a double homicide made a shred of difference to the Defendants.[2]

***An Off-Duty Police Officer and a Store Owner are Murdered in Queens***

42.     In the early morning hours of December 21, 1996, Ira "Mike" Epstein, the owner of a local check cashing store on Astoria Boulevard in East Elmhurst, Queens, and NYPD Officer Charles A. Davis, who was working off-duty as Epstein's security guard, were shot and killed in the failed armed robbery of Epstein's store (the "Astoria Boulevard Murders" or the "Murders").

43.     A manhunt for the killers began immediately. The *New York Times* described an "intensive sweep throughout northwestern Queens" that ensued in an attempt to identify and arrest the perpetrators — with "thousands of cars" stopped, "thousands of summonses" issued, and "hundreds of suspects" questioned. Randy Kennedy, *3 Charged in Killings of Officer and Businessman in Queens*, N.Y. Times, Dec. 26, 1996.

44.     Then-Mayor Giuliani and top NYPD officials immediately declared that they "would not rest" until the crime was solved and began exerting intense pressure on the Police Department to solve this "Christmas Tragedy" before the holiday a few days away.

45.     The initial investigation of the crime immediately pointed to a local gang (later revealed to be known as "Speedstick") that had committed multiple similar armed robberies around the neighborhood.

46.     The day after the murder, the *Daily News* reported that a "gang" had "ambushed" Epstein and Davis and that "[i]nvestigators believe the killers may be the same robbers who hit

---

[2] It is also worth noting that neither of Mr. Bell's co-defendants was a likely suspect in a double homicide either. Gary Johnson was a 22-year-old store clerk with no criminal record. Rohan Bolt was a 35-year-old married father of four and owner of a local Caribbean restaurant, who did not know Bell or Johnson and whose criminal record was only minor marijuana-related violations from years prior.

two other check-cashing businesses in Queens last week, the latest one on Friday [December 19, 1996] in Queens Village."

47.     Consistent with this belief that a local gang that had robbed two other check-cashing businesses in the neighborhood had also committed this crime, the NYPD covered the neighborhood with wanted posters stating that the suspects "were involved in a past robbery at a check cashing business in the 105 Pct. [in Queens]." These wanted posters described the suspects as three black men ranging from 5'11" and 6'3" in height and weighing 180, 185 and 190 pounds, respectively.

48.     George Bell did not fit any of these descriptions. At the time, he was 5'10" and weighed only 150 pounds. He was a skinny teenager. He had no criminal record.

49.     The NYPD also put out an "all points bulletin" which pointed to this stickup gang as the lead suspects. The bulletin described three suspects in a robbery of another check cashing store nearby and stated that "two of the above individuals may be connected to the murder of the police officer on 12/21/96 in 115PCT."

50.     Again, the suspects described were taller than George Bell and weighed significantly more.

51.     This "all points bulletin" was withheld from Mr. Bell's counsel until *after* his trial.

52.     Police DD5s *that were not produced until Mr. Bell's case was reinvestigated in 2020* demonstrate that the police believed the two robberies of check cashing stores in Queens two days apart had similar "MOs," including the time of day the robberies occurred, the number of participants, and the method of entry into the store.

***Mr. Bell is Implicated by a Mentally Unstable Drug Dealer***

53.     On December 23, 1996, police arrested 20-year-old John Mark Bigweh for selling marijuana.

54.     Bigweh was on probation for robbery and assault charges and faced significant criminal and immigration consequences if he did not cooperate with the police.

55.     Police saw an opportunity and they used this leverage and their desperation to solve the murder before Christmas (as Mayor Giuliani had directed police brass to do) to somehow turn Bigweh from a low-level drug dealer to an accomplice to murder.

56.     Over the course of three unrecorded interrogations over two days, Bigweh told an evolving story that eventually ended with Bigweh confessing to participating in the crime and falsely claiming that George Bell was the shooter.

57.     Bigweh knew that Mr. Bell had sex with Bigweh's girlfriend. They were not friends.

58.     Bigweh's evolving description of the crime made clear from the start that he was not a reliable witness.

59.     When Bigweh was first interrogated about the murder (after being arrested for marijuana possession), he stated that he was not a participant in the crime. He claimed he had been out partying with Bell and Gary Johnson on December 20th and 21st, and they later approached him on the street about going with them to commit a robbery, which Bigweh refused to do. Bigweh also named an unknown accomplice named "Zebedia" as a participant in the robbery.

60.     Bigweh was then driven around in a van for six hours with Detective Michael Falciano, known as "the Falcon."

10

61.     After six hours with the Falcon, Bigweh implicated himself in the crime. In his second statement, Bigweh admitted that he had participated in the crime along with Bell, Johnson, someone named "Roti," and a getaway driver named "Jason." Zebedia had now disappeared from the story. Bigweh also oddly claimed that the five men had driven to Bigweh's home so he could change from a green jacket to a navy blue one.

62.     To this day, there is no independent evidence (i.e. evidence other than Bigweh's own statement) tying Bigweh to this crime.

63.     Nonetheless, based on Bigweh's statement *alon*e, police turned their attention away from a local robbery gang with an MO of sticking up check cashing stores, and towards Mr. Bell—a 19-year-old stock boy at Old Navy with no criminal record.

### NYPD Officers Beat and Threaten Mr. Bell Until He Confesses

64.     Rather than seek a warrant for Mr. Bell's arrest, which would have triggered his right to counsel, NYPD officers set up a ruse to draw him out of his house.

65.     Police instructed Bigweh to call Mr. Bell and Gary Johnson and falsely tell them that Mendez Collier, Bell's friend and Johnson's cousin, had been arrested and needed help.

66.      The trick worked. Mr. Bell, who had been sick for several days and had just taken NyQuil, left his house shortly after midnight on Christmas morning intending to go to the precinct to help his friend in need.

67.     Instead, Mr. Bell was immediately arrested, as was Mr. Johnson.

68.     Even though the officers of the 115th precinct were investigating the murder, Mr. Bell was taken to the 109th precinct to be interrogated.

69.     When Mr. Bell's mother arrived at the local 115th precinct in the middle of the night after learning her son with limited mental capacity had been arrested, she was told that he was not there and the police did not know where he was.

11

70.     Mr. Bell was intentionally hidden from his family who was trying to find him. Had they found him, Mr. Bell would have obtained counsel.

71.     Instead, Mr. Bell, a 19-year-old with limited mental capacity and no experience with the criminal justice system, suddenly found himself handcuffed to a chair at a Queens police precinct in the middle of the night on Christmas.

72.     Mr. Bell knew he had committed no crime and sat alone, confused, terrified, and crying for his mother (who was out looking for him).

73.     Defendants Pia and Sica did not document what happened to Mr. Bell between midnight and 9:30 a.m. on December 25, 1996.

74.     Rather, Defendants Pia and Sica wrote a mere a one-paragraph report stating that they interrogated Mr. Bell for hours at the 109th Precinct and that, by 9:30 a.m. they had obtained a three-page statement written out by Pia and signed by Mr. Bell.

75.     Defendants Pia and Sica did not document what this "interrogation" consisted of.

76.     Defendants Pia and Sica did not report that they had manipulated, intimidated, and beaten Mr. Bell in order to obtain that "confession."

77.     Upon arriving at the station, Mr. Bell sat for hours cuffed to a chair, given no explanation for why he was there other than that he was "in big trouble" and no access to an attorney or his family.

78.     Sometime in the middle of the night, a sleep deprived and traumatized Mr. Bell was brought to an interrogation room where he was met by Defendant Detective Sica and, later, by Defendant Detective Pia.

79.     Defendants Pia and Sica did not videotape or audiotape the interrogation.

80.     Defendant Pia and Sica did not read Mr. Bell his *Miranda* rights. They simply handed him a piece of paper (waiving his rights) and demanded that Mr. Bell sign it.

81.     To the shock of Mr. Bell, Defendant Sica immediately accused him of murder.

82.     Defendant Sica told Mr. Bell words to the effect of: "you know why you are here, you killed a police officer."

83.     Mr. Bell had no idea what Sica was talking about .

84.     Mr. Bell immediately denied any involvement in any murder.

85.     Defendant Detective Pia arrived shortly thereafter and began screaming and cursing at Mr. Bell.

86.     Mr. Bell maintained that he did not know what the officers were talking about.

87.     As Mr. Bell insisted he had no knowledge of any murder, Defendant Pia's interrogation turned violent.

88.     Defendant Pia pressed a hockey stick up against Mr. Bell's neck and threatened him that he could "use [his] head as a hockey puck."

89.     Every time Mr. Bell would deny that he had committed a homicide, Defendant Pia hit Mr. Bell and knocked him to the floor.

90.     Defendant Pia yanked Mr. Bell by his braids, tearing hair from his scalp and unbraiding his tightly braided hair.

91.     Defendant Pia demanded that Mr. Bell implicate himself or the violence would continue.

92.     And it did continue, over and over.

93.      Defendant Pia told Mr. Bell that he would "put him in the fucking hospital" unless Mr. Bell told him what he wanted to know.

94.     Defendant Sica sat in the room, mere feet away from Mr. Bell as Defendant Pia repeatedly beat Mr. Bell.

95.     Defendant Sica did not intervene to stop Defendant Pia's actions in any way.

96.     Sica affirmed Defendant Pia's violent tactics and encouraged Mr. Bell to cooperate with Pia's demands.

97.     Mr. Bell, fearful for his life, asked Defendant Sica, "Isn't this police brutality?"

98.     Sica responded, "No, this is how we get things done."

99.     Both Defendants Pia and Sica screamed at Mr. Bell that he would never see his family again unless he confessed.

100.    Both Defendants Pia and Sica screamed at Mr. Bell that he would get the electric chair unless he confessed.

101.    Mr. Bell maintained his innocence and begged to call his mother. Mr. Bell also asked for a lawyer. In response to that request, Defendant Pia responded that "cop killers don't get attorneys."

102.    But Mr. Bell—sleep deprived, just 19 years old with a low IQ, terrified, and willing to do anything to make the abuse stop—eventually broke down.

103.    Mr. Bell began repeating facts that Detective Pia—who admitted at trial that he had read Bigweh's statement immediately before the interrogation—fed to him. Mr. Bell told Pia "what he wanted to know" to make the abuse and threats stop.

104.     Approximately nine-and-a-half hours after he was arrested, a delirious and beaten-down Mr. Bell signed a statement he did not read, written entirely by Pia, falsely implicating himself in a double homicide.[3]

105.     Mr. Bell's supposed confession did not lead law enforcement to a single piece of information or evidence that police did not already know from other sources. It also contained the false accusation, provided to Mr. Bell by his interrogators, that Mendez Collier, or "Carl" had participated in the crime.

106.     No murder weapon or any physical evidence tying Mr. Bell to the crime was ever discovered.

107.     Mr. Bell's confession contradicted known facts about the case, such as the color of the van that was used and the number of times the victims were shot.

108.     Once the statement was signed, Mr. Bell was finally brought back to a holding cell and allowed to go to sleep.

109.     Not satisfied with having pummeled Mr. Bell into signing a written confession, Defendants Pia and Sica sought a video-taped confession.

110.     At approximately 12:22 p.m. (approximately 3 hours after his nine-hour through the night interrogation), Mr. Bell was brought back to the interrogation room to give his "confession" on video to Assistant District Attorney Peter Reese.

---

[3] This was not the first time Detective Pia used violence as a means to extract a false confession. In 1995, just one year before Mr. Bell was arrested, Pia elicited the confession of a man named Amaury Rosario in connection with a different robbery and homicide. Mr. Rosario testified both at a suppression hearing and at trial that Pia kicked him, handcuffed his left wrist to his right ankle, placed him in a headlock until he lost consciousness, punched him in the groin and, after Mr. Rosario requested an attorney, placed a revolver in Mr. Rosario's mouth and told him he had two choices "to live or to die." Amazingly, the prosecution did not call Detective Pia as a rebuttal witness at Mr. Rosario's trial despite the serious accusations Mr. Rosario made regarding how he had come to confess. Mr. Rosario was acquitted of all charges. *See* Ind. No. 5644/95 (Sup. Ct. Queens Cnty).

111.    Defendants Pia and Sica remained in the room with Reese for the whole recording.

112.    The videotape of the "confession" shows that Mr. Bell's braids had become undone and disheveled—the result of Pia repeatedly knocking him to the ground and picking him up by his braided hair until he implicated himself.



113.    Mr. Bell—fearing another beating from Pia if he didn't comply—repeated his false statement.

114.    Mr. Bell can be heard on the videotape stating that he was "being framed."

115.    No one on the videotape is heard asking Mr. Bell any questions about his statement that he was "being framed."

116.    Mr. Bell can be heard on the videotape asking Detective Pia if he "did good," after giving a narrative explaining his involvement.

117.    At one point during the video, ADA Reese tells Bell that he is going to "show [Bell] a picture of an individual" to see if Bell can identify that person, to which Bell matter-of-factly responds, "I know, you showed me," referencing the earlier interrogation.

118.    Mr. Bell can be heard on the videotape asking ADA Reese if he can speak to him alone.

119.    ADA Reese never gave Mr. Bell the opportunity to speak with him alone.

120.    All of these unusual comments and requests were ignored by the various law enforcement officials present.

121.    After securing Mr. Bell's written and video "confessions," Defendants Pia and Sica realized they made a mistake. They had coerced Mr. Bell into implicating his friend, Mendez Collier (known as "Carl"). After obtaining this statement from Mr. Bell, the police concluded that "Carl" had "absolutely nothing" to do with the crime.

122.    Defendant Sica then falsified a DD5 to try to "correct" the inaccurate information that had been fed to Mr. Bell.

123.    On December 25, 1996 at approximately, 3:15 p.m., Defendant Sica wrote that he and Detective Pia had a "brief conversation with [Bell] . . . in the 109 Pct. Cell" during which Mr. Bell purportedly told Pia and Sica that he had wrongly accused his close friend Carl because "John [Mark Bigweh] was close to ROTI [Bell's exonerated co-Defendant, Rohan Bolt] and that he [George] was afraid that he would be hurt in jail if he gave up John [Mark Bigweh]."

124.    There was no signed document by Mr. Bell concerning this statement.

125. This conversation was a fabrication. Mr. Bell never said what the DD5 falsely stated.

126. Mr. Bell's "confession" is false on its face and this falsity was apparent at the time. Mr. Bell was asleep in bed on the morning of the Murders, and there are at least 10 statements in Mr. Bell's coerced statement that are impossible, that contradict known facts about the murder, or that contradict the police's own contrived theory of case.

127. **Statement No. 1:** Mr. Bell stated that the car used was "burgundy." As the QDAO acknowledged in open court in June 2021 when announcing Mr. Bell's indictment would be dismissed, four independent eyewitnesses at the crime scene identified the van as blue. As the People conceded at Mr. Bell's June 2021 dismissal hearing: "One of those eyewitnesses went so far as to identify the perpetrators entering and fleeing in a blue Ford Aerostar van immediately after the Murders, and in fact the sketch of this van was drawn by an NYPD sketch artist back in 1996." The NYPD had in fact recovered a stolen blue Ford Aerostar van "less than an hour after the crime approximately 20 minutes away" from the crime scene, after police received a report of the van being stripped by three Black men in the vicinity of the crime. Shockingly, this information was documented in DD5s but never disclosed to the defense.

128. **Statement No. 2**: Mr. Bell stated none of the assailants wore gloves and that they pushed the victims into the store, took the keys to the safe, and attempted to open it. Yet, none of the fingerprints taken from the scene matched Mr. Bell's or any of his co-Defendants'.

129. **Statement No. 3:** Mr. Bell stated that he fired three or four shots with no gloves on and then went home and changed clothes. No gunshot residue was found on Mr. Bell's clothes recovered from his home.

18

130.    **Statement No. 4:** Mr. Bell stated that his good friend, Mendez Collier, who was also arrested for the crime and was in custody at the time Mr. Bell was arrested, was his co-conspirator in the Murders. But police concluded later that same day that Collier had "absolutely nothing" to do with the Murders and "voided" his arrest.

131.    **Statement No. 5:** Though Mr. Bell had only drawn the police's attention because Bigweh had confessed and named him as the shooter, Mr. Bell did not name Bigweh as having any involvement in the crime.

132.    **Statement No. 6:** Mr. Bell stated that he shot Epstein "3 or 4 times" in the chest. Epstein suffered a single, fatal gunshot wound.

133.    **Statement No. 7:** Mr. Bell stated that all five perpetrators were carrying guns. Gary Johnson stated there was only one gun, while Bigweh stated there were two. Not a single other person ever stated that all five perpetrators carried guns. No gun was ever recovered.

134.    **Statement No. 8:** Mr. Bell stated that he had known his co-defendant "Rowdy" for "2 years or so" and describes him as "19 or 20" years old. The man the QDAO convicted as "Roti," Rohan Bolt, was 35 years old at the time of the crime. Despite having claimed that he knew "Rowdy" for two years, Mr. Bell was unsure of how to pronounce his name, or even what his name was, referring to him as "Rowdy, Rody, whatever his name is."

135.    **Statement No. 9:** Mr. Bell was asked how many people were involved in the crime and initially replied, "Four." He was then pressed by ADA Reese with suggestive questions indicating that the "correct" answer was five. Mr. Bell then changed his answer to "Five." Neither ADA Reese nor the two detectives in the room at the time followed up as to why Mr. Bell was unable even to identify the number of accomplices with whom he purportedly committed the brutal double murder.

136.    **Statement No. 10:** Mr. Bell stated he hid the gun "by some leaves . . . over by some rocks" on the "roof of the bomb building"—a well-known location a few blocks from the crime scene. But a search of this building that included at least 35 officers, a canine search team, and a sewer-dredging operation did not locate any gun, or any evidence related to the crime. Moreover, police were on the scene minutes after the murder and a manhunt for the shooters was underway immediately. It is unbelievable that Mr. Bell—a 19-year-old with limited mental capacity and no criminal record—somehow outmaneuvered the whole NYPD response team on the hunt for the shooter of a police officer, to stash the murder weapon (that was never found) "by some leaves" or "over by some rocks" on the roof of a well-known neighborhood landmark.

137.    These statements are simply illustrative examples, and a review of Mr. Bell's statement reveals numerous additional inconsistencies with the statements of co-defendants and with the facts of the case—which were obvious to Defendants Pia and Sica at the time.

138.    Moreover, Defendant Pia's and Sica's use of the "Reid technique"—a technique that is no longer used by leading schools of interrogation due to its tendency to produce false confessions—further undermines the accuracy of the confession.

139.    In sum, Mr. Bell's statement bore all indications of a textbook false confession, and any so-called evidence elicited from Mr. Bell was entirely unreliable.

***Police Obtain Another False Confession from Gary Johnson***

140.    At the same time Mr. Bell was being threatened and beaten, Defendants Cardamone and Brooks were obtaining another false confession from Mr. Bell's co-defendant, Gary Johnson.

141.    Like Defendants Pia and Sica, Defendants Cardamone and Brooks did not record anything that occurred during the twelve hours that they interrogated Mr. Johnson.

20

142.    Johnson's confession was also facially unbelievable in numerous ways.

143.    Johnson stated that after an evening of hard partying the night before, he passed out, and that he "was still drunk" the next morning and "[didn't] know what time it was when I woke up."

144.    Johnson stated that he had driven to the check cashing store with someone named "Jason" and "two of Jason's friends that I didn't know." He added that he didn't really know Jason either.

145.    Johnson also claimed (contrary to Bigweh and Mr. Bell) that Mr. Bell was already at the check cashing store when they arrived and the he and Mr. Bell did not speak that morning. In other words, Johnson claimed that he committed this crime with three people he did not know and Mr. Bell—who he hadn't spoken to prior to arriving. When pressed on this striking claim, Johnson stated that he did not even remember the crime but had "seen it on the news" but he "didn't think [he] was involved in it because [he ] woke up and it was just another day for [him]."

146.    Johnson also could not decide if he had spoken to Mr. Bell after the Murders, first claiming that when he "woke up in the morning [he] called [Mr. Bell]. We were talking and I was asking him what are you gonna do today. He said he was sick or something." Johnson then changed his mind and said he had only spoken to Mr. Bell's sister and he "never really got a chance to talk to Bell" in the four days since they had apparently committed a double homicide together.

147.    Johnson screamed as he was being interrogated. Johnson's confession was also obtained through police coercion.

148.    Defendants Cardamone and Brooks knew this unbelievable confession was false.

149.     Defendants Cardamone and Brooks provided this false confession, implicating Mr. Bell, to prosecutors.

150.     Upon information and belief, Defendants Cardamone and Brooks never informed prosecutors that Johnson's confession implicating Mr. Bell was false.

151.     Upon information and belief, Defendants Cardamone and Brooks never informed prosecutors that this confession was obtained through coercion.

152.     Because Defendants Cardamone and Brooks concealed that they had coerced Johnson's confession, neither the prosecutors nor the jury ever learned that police had coerced a false confession from another co-defendant at the same time that they had coerced Mr. Bell's.

153.     Mr. Bell's defense counsel was never informed that Johnson's confession was false and obtained through coercion.

### Police Admit to Obtaining Another False Confession from Jason Ligon

154.     Perhaps most tellingly, yet another false confession—which police have since admitted was false—was obtained in the same case and provided detailed facts extremely similar to Mr. Bell's confession.

155.     Bigweh had identified someone named "Jason" as the getaway driver, a detail that Mr. Bell and Gary Johnson both repeated (having been fed the statement by the police).

156.     On May 30, 1997, the police arrested a man named Jason Ligon. After five hours in police custody, Defendants Bubelnik and Bovino secured Ligon's confession to his purported involvement in the Murders.

157.     Defendants Bubelnik and Bovino worked in close collaboration with Detectives Sica and Pia, and fed the same facts to Jason Ligon that Pia and Sica fed to Mr. Bell.

158.    Defendants Bubelnik and Bovino were intimately familiar with both the true facts and coerced falsehoods about the Astoria Boulevard Murders. Defendant Bubelnik was one of the officers present at Bigweh's confession.

159.    Defendants' Bubelnik and Bovino orchestrated and supervised Bell's and Bolt's lineups on December 26, 1996, and the fingerprinting of Bell, Johnson, Bolt, and Bigweh.

160.    They had all of the knowledge of the case to ensure that Ligon's confession would line up with Mr. Bell's.

161.    Like Mr. Bell, Ligon confessed that he (Ligon) was the driver, that Bell was the shooter, and that Bolt (his name now having evolved from "Roti" to "Rohan") put the robbery plan together.

162.    In fact, Ligon went into even more extensive detail than Mr. Bell about the plan for the robbery, what was discussed among the men committing the crime, and how the plan was executed.

163.    Though Ligon's video and written confession mirrored Mr. Bell's (except it was more detailed), Ligon was not even in New York at the time of the Murders.

164.    Ligon's counsel hired a private investigator who determined that Mr. Ligon was *in Washington, D.C. at the time of the Murders*. *See Bell*, 71 Misc. 3d at 650.

165.    Ligon's private investigator provided this alibi to District Attorney Investigators Teddy Wess and Stanley Carpenter, who confirmed its accuracy on their own trip to D.C.

166.    Wess and Carpenter determined that the evidence established that Ligon was not involved in the Astoria Boulevard Murders.

167.    Upon information and belief, Ligon had no motive to falsely implicate himself in a crime he did not commit.

168.     Accordingly, upon information and belief, Ligon's (false) confession was obtained through police coercion.

169.     Ligon has since told investigators that police officers provided him with alcohol during the interrogation.

170.     Wess and Carpenter stated to Ligon's private investigator that, notwithstanding Ligon's innocence, the charges against him would not be dismissed until Mr. Bell, Johnson, and Bolt were tried.

171.     Wess and Carpenter further told Ligon's private investigator that they were aware that Ligon was facing felony drug charges in a separate case, and that the time he spent incarcerated as a result of his arrest in connection with the Astoria Boulevard Murders (crimes the QDAO knew he did not commit) would be credited against the time he would ultimately serve on the drug charges.

172.     In other words, the QDAO contemporaneously acknowledged that (1) they knew Ligon was innocent and had given a false confession; but (2) would nonetheless not dismiss the case against Ligon until after Bell, Bolt, and Johnson were tried.

173.     The clear implication being that Wess and Carpenter, in conjunction with Defendants Bubelnik and Bovino, did not want to admit that Ligon was innocent and the police had coerced a false confession.

174.     And this is exactly what happened. Even though Defendants Bubelnik and Bovino and the DA investigators knew of Ligon's' alibi months before Bell's trial, charges against Ligon were not dropped until Bell, Johnson, and Bolt had all been convicted.

175.     Bell's counsel was never informed by the QDAO that Ligon's confession was false.

176.    Defendants Bubelnik and Bovino knew Ligon's confession implicating Mr. Bell was false, but nonetheless provided it to prosecutors.

177.    Mr. Bell's defense counsel was never informed that Ligon was innocent, that his confession was false, or that police officers coerced his confession.

178.    This proof of Mr. Ligon's innocence was *Brady* material that was not produced to Mr. Bell's counsel.

179.    On information and belief Defendants Bubelnik and Bovino never informed prosecutors that Ligon's confession was obtained through coercion. Alternately, if prosecutors knew that Ligon's confession was obtained through coercion, they wrongfully withheld this *Brady* material from Mr. Bell's defense team.

180.    Moreover, as the QDAO acknowledged in June 2021, "Det. Bubelnik also had a pending lawsuit against her at the time of trial which stemmed from a previous case in which she was accused of coercing a false confession from the defendant in that case."

181.    Defendant Bovino was also a defendant in that "pending lawsuit," and was also accused of participating in extracting a false confession.

182.    That lawsuit was ultimately settled.

183.    That Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant was *Brady* material.

184.    Prosecutors never disclosed to Mr. Bell's defense team that Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant.

185.    On information and belief, Defendants Bubelnik and Bovino did not inform the QDAO about this prior lawsuit. Alternately, if prosecutors knew about this prior lawsuit, they wrongfully withheld this information from Mr. Bell's defense team.

186.    Because these Defendants concealed Ligon's coerced confession, the jury never learned that the police had extracted a false confession from another co-defendant that was very similar to Mr. Bell's false confession.

187.    Because these Defendants concealed Ligon's false confession, the jury never learned that Mr. Bell's "admission" in his coerced confession that Jason was the driver was indisputably false.

***A Media Frenzy Follows Mr. Bell's Arrest***

188.    Mr. Bell was convicted in the press before he ever entered a courtroom.

189.    Mayor Giuliani appeared at a press conference on Christmas Day with high-level police brass to praise the detectives who led the investigation for cracking the case.

190.    Mayor Giuliani kissed Detective Falciano at the press conference as he thanked him cracking the case by eliciting Bigweh's confession.

191.    The *Daily News* ran a front-page story with a picture of Mr. Bell in tears and labeled him the "CRYBABY COP KILLER"—crybaby because he was brought to tears by the terror of being falsely accused of a double murder when he was at the police station.

192.    The *Daily News* would later run a full-page editorial advocating that Mr. Bell be put to death.

193.    The police orchestrated a "perp walk" of Mr. Bell and the *New York Post* ran a front-page story with a picture zoomed in all the way on Mr. Bell's face during the perp walk with the headline "THE FACE OF EVIL."

***The Defense Seeks and is Denied Highly Probative Brady Material***

194.    From the very start of Mr. Bell's criminal proceedings, his attorneys consistently sought *Brady* material regarding police investigations into other suspects.

26

195.    On March 25, 1997, Bell's lawyers served a "demand to produce" which specifically requested (1) "any evidence or information, and any reports or documents, including but not limited to . . . police reports, memoranda, [or] witness statements . . . indicating that any person, other than the accused and the co-defendants in the instant indictment, is a suspected perpetrator of any of the crimes charged"; (2) "whether any prosecution witness has ever received any treatment, therapy or psychiatric care"; (3) "written reports or documents . . . concerning any mental examination of a prosecution witness that was recommended or facilitated by a public servant, including psychological testing or counseling"; (4) "any informant operating in cooperation with law enforcement officials"; and (5) "any evidence or information which indicate that any custodial statement by the accused or any co-defendant [the requests define "co-defendant" to mean "ROHAN BOLT, GARY JOHNSON, AND JOHN MARK BIGWEH"] is involuntary, inaccurate, incomplete, the product of threats or inducement, or otherwise unreliable."

196.    When making this request, Mr. Bell's defense team also cited to the news reports prior to Mr. Bell's arrest (described above) about the police's investigation of check cashing store robberies with the same M.O.

197.    On April 7, 1997, ADA Neal Morse responded under oath that "The Queens DA are not in possession of, or aware of, any *Brady* material. The Queens DA acknowledge its continuing obligation to provide *Brady* material should the same become known to the Queens DA."

198.    Johnson's and Bolt's counsel made materially identical requests and received the identical blanket denials in sworn affirmations from ADA Morse and ADA Ira Dorfman.

199.    Proof that the NYPD had strong evidence of Speedstick's involvement reemerged on May 9, 1997, almost two years before Mr. Bell's trial would ultimately begin, when two off-duty police officers were attacked while delivering payroll to a business in Flushing, Queens.

200.    Aaron Boone and Robert Majors were arrested in connection with this attack.

201.    In reporting on the arrests, the *Daily News* stated that "Boone and Majors are suspects in other payroll heists in Queens, including a December ambush that killed a check-cashing firm owner and off-duty Police Officer Charles Davis."

202.    The *Daily News* report was based on information provided to the reporter by the NYPD.

203.    Defendant Paul Heider signed a felony complaint against Boone and Majors on May 10, 1997.

204.    This reporting led to another round of requests for *Brady* material in the Bell, Bolt, and Johnson cases regarding other potential suspects.

205.    In October 1997, when still no *Brady* material had been produced, Bell's counsel filed a motion to compel the *Brady* material sought in his prior request and cited to the May 1997 *Daily News* article clearly reflecting that the perpetrators of the failed armored car robbery gang were suspects in the crime that Mr. Bell was accused of.

206.    Bell's counsel also expanded his request to seek information regarding the newly-arrested Jason Ligon.

207.    The QDAO responded in a sworn affirmation signed by ADA Gary Fidel by continuing to falsely deny the existence of any *Brady* material and specifically stating "[T]here is no evidence pointing to any uncharged person as being involved in the crimes charged."

208.     Relying on ADA Fidel's false sworn statement, the trial judge denied Mr. Bell's motion to compel evidence linking the armored car robbery to the Astoria Boulevard Murders, but with the admonition that "The Queens DA are reminded of their continuing duty to make *Brady* material available to the defense if and when such evidence comes into their possession, knowledge and control."

209.     Neither the defense team nor the trial judge, however, could force the prosecution to turn over evidence that they continued to (falsely) claim did not exist.

210.     On January 19, 1999, Bell's counsel followed up again regarding Jason Ligon. Mr. Bell's counsel wrote to the ADA and specifically requested any information that Jason Ligon—who had by then been in jail for two-and-a-half years—was not actually involved in the Murders.

211.     Two days later, on January 21, 1999, ADA Linda Cantoni responded with the QDAO's continuing refrain that: "[T]he Queens DA are not in possession of any material or information regarding Jason Ligon, whom the Queens DA are prosecuting as one of defendant's accomplices, that would constitute *Brady* or *Giglio* material as to defendant George Davis Bell," and again promising "should any *Brady* or *Giglio* material come into the Queens DA's possession in the future, the Queens DA will disclose it at the appropriate time."

212.     This statement, like QDAO's other denial, was false.

213.     In a post-trial affirmation submitted by Queens ADA Cantoni on March 29, 2005, Cantoni recounts that Greg Lasak, lead counsel on the case during all pre-trial discovery and the Executive ADA responsible for the homicide investigations, informed her that "sometime prior to January 1999, Ligon recanted" his confession "and stated that he was not present at the robbery and murder."

214.    Bell's defense was never informed prior to trial that Ligon had recanted his confession, as detailed above.

215.    Even having been denied *Brady* material, Mr. Bell's counsel tried to call Defendant NYPD Detective Paul Heider at trial knowing that he had investigated the Flushing robbery.

216.    Queens ADA Charles Testagrossa—lead trial counsel and the Chief of the Major Crimes Bureau, represented to the Judge that there was "no connection" between the crimes Heider was investigating and the crimes for which Mr. Bell was charged. Defendant Heider was precluded from testifying at Mr. Bell's trial.

217.    Likewise, when Bell's counsel asked Defendant William Nevins, the Commanding Officer of the Queens Homicide Squad whether "[t]here was also a robbery of a check cashing place that occurred in May of 1997," ADA Testagrossa objected, and the Court (on the basis of Testagrossa's ongoing false statement that there was no connection between the crimes) sustained the objection.

218.    When Mr. Bell's attorney asked if "the people that were arrested were Aaron Boone and Robert [Majors]," ADA Testagrossa again successfully objected. *Id.*

219.    When Mr. Bell's attorney began a line of questioning regarding why guns recovered during the investigation of the armored car robbery in 1997 were tested against ballistics evidence at the check cashing store, ADAs Testagrossa and Leventhal, in open court, disclaimed any knowledge of why these tests were conducted and accused Bell's defense team of embarking on a "fishing expedition."

220.    ADA Testagrossa went even further, calling the two cases "completely different" and pronouncing that they had "no connection," other than the one the defense had been trying, desperately, to contrive.

221.    The trial judge denied the defense further discovery on the basis of these (now proven to be blatantly false) representations.

222.    Similarly, when the defense tried to call the NYPD's fingerprint expert to the stand to establish that he had compared Speedstick member Jamal Clark's prints to those found at the murder scene, ADA Leventhal brashly stated that "there is no issue with respect to the fingerprints within the premises, and any other fingerprints that were taken somewhere else. It's collateral and irrelevant."

223.    Once again, the prosecution's false representations to the Court denied the defense the opportunity to present evidence reflecting the NYPD's investigation into Speedstick as alternative (and ultimately the correct) suspects.

224.    As part of a reinvestigation of Mr. Bell's conviction, the QDAO Conviction Integrity Unit produced the handwritten notes of ADA Charles Testagrossa.

225.    These notes, taken in 1997 (over a year before Mr. Bell's trial) in a folder labeled "Speedstick" reveal that Defendant Heider and Testagrossa discussed Defendant Heider's Speedstick investigation.

226.    The notes state that Testagrossa was informed that Heider "[b]elieve[d] Jamal was driver in Davis homicide [the homicide for which Mr. Bell was convicted]"; "Jason was Jamal"; and "Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark 'Jason.'"

227.    Upon information and belief, when Defendant Heider was called to testify at Mr. Bell's trial in 1999, ADA Testagrossa consulted with Defendant Heider as to the relationship between Mr. Bell's case and Speedstick.

228.    Upon information and belief, Defendant Heider falsely told ADAs Testagrossa and Leventhal that there was no connection between the cases

229.    In the alternative, upon information and belief, Defendant Heider truthfully told Testagrossa and/or Leventhal that there was a connection between the cases.

230.    Yet, notwithstanding Defendant Heider's revelation about the connection between Mr. Bell's case and Speedstick, Testagrossa and Leventhal lied to the Court.

231.    In other words, upon information and belief, either Defendant Heider lied to ADAs Testagrossa and Leventhal or the ADAs lied to the Court.

232.    The ADA's misrepresentations to the Court claiming that there was no connection between the cases was the result of an effort by Defendant Heider to conceal the truth.

233.    Alternately, upon information and belief, ADA Testagrossa remembered his 1997 conversation with Defendant Heider, and made these false representations to the Court even though he was personally aware that Jamal Clark, a known Speedstick member, had admitted to participating in the Astoria Boulevard Murders.

***Mr. Bell is Convicted on the Basis of His False Confession***

234.    Mr. Bell was convicted of murder in the first degree on June 11, 1999.

235.    Beyond Mr. Bell's false confession, the rest of the case against him was weak to non-existent.

236.    There was no physical evidence whatsoever tying Mr. Bell to the crime.

237.    Bigweh, who was the only reason Mr. Bell had (erroneously) become a suspect, did not testify.

238.    The only additional evidence the DA offered was testimony from one eyewitness and one jailhouse informant.

239.    The eyewitness, Gregory Turnbull, saw the suspects flee from approximately 180 feet away before sunrise and, even after 14 hours of police interrogation, refused to provide a description to a sketch artist because he thought any sketch he would provide "could have been anybody" and he "didn't want the wrong person to be picked up."

240.    Turnbull's refusal to provide a sketch was not noted in the DD5 provided to the defense regarding his interrogation.

241.    By the time of Mr. Bell's trial, upon information and belief, either the NYPD or the QDAO had shown Turnbull photos of Mr. Bell.

242.    The jailhouse informant, Reginald Gousse, was equally unreliable.

243.    Gousse was facing charges related to two armed robberies.

244.    Gousse's testimony about the crime simply restated information that was already available through public news sources, including repeating errors that been publicly reported, such as that Epstein was shot multiple times, when he died of a single gunshot wound.

245.    Gousse also received what the *New York Times* labelled the highly "unusual" step from the QDAO , when they did an "extraordinary favor" for him of preventing his deportation to Haiti by arguing for Gousse's "immediate release" so that immigration authorities could not detain him upon release from custody.

246.    Mr. Bell never spoke to Gousse about anything related to Mr. Bell's case.

247.    Gousse later went on to carjack and tragically murder a father of three.

248.    Even with his life at stake after his conviction, Mr. Bell continued to maintain his innocence.

33

249. Before sentencing, the DA offered to allow Mr. Bell to plead guilty and avoid the death penalty.

250. Mr. Bell rejected the DA's offer because he would not plead guilty to a heinous crime he did not commit.

251. The case proceeded to the capital phase, and Mr. Bell is alive today only by mercy of the jury, which declined to impose the death penalty.

252. Mr. Bell was sentenced to life in prison without the possibility of parole on July 27, 1999.

### *Mountains of Unproduced* **Brady** *Material is Revealed*

253. In the years following Mr. Bell's conviction, significant *Brady* material has emerged that was never turned over to the defense.

254. The most significant of these revelations is DD5 288. This DD5 documents that by May 1997 at the latest, police were aware that a member of the Speedstick gang had confessed to the Astoria Boulevard Murders for which George was convicted.

255. DD5 288, dated May 16, 1997, and prepared by Defendant Heider (the very witness Mr. Bell had attempted to call at trial to explore the connection between the May 1997 robbery and the murder with which he was charged), memorializes an interview of "Witness #1" who provides a detailed account of the activities "of a Robbery Ring that was run by the Twins Aaron and Ammon Boone."

256. By way of background, DD5 288 provides a detailed description of the robbery gang's operations and provides summaries of at least *seven* armed robberies carried out by the group in 1996 and 1997.

257.   Witness #1 identified Jamal Clark as a member of the robbery gang and stated that he had personally participated in several of the robberies with Clark and one or both of the Boone Twins.

258.   Several of these robberies carried out by Speedstick involved victims being shot, stabbed, or sliced.

259.   DD5 288 then goes on to directly implicate this robbery gang in the murder for which George Bell was convicted. The DD5 provides:

> **[Witness #1] stated that he was told by Jamal Clark that the group robbed a check cashing store on Astoria Blvd. This job was set up by the [Boone] Twins and that Jamal Clark was outside and that something went bad. They did not get any money.** Witness #1 stated that this was a phone call and that Jamal Clark was down south at the club with the Twins after this robbery. Jamal told him that he was upset because he was doing a lot of jobs also in NY and down south and that he was not getting a fair share of the money. He was concerned that if he left that the Twins may kill him because they felt that he knew to[o] much and could tell the police. Jamal told him he was leaving and he did.
>
> *Witness #1 stated that Jamal Clark had a code name for all the robberies that he participated in with the group. The name is JASON.

(emphasis added).

260.   DD5 288 also reports that Clark's fear of being murdered was well-founded.

261.   Witness #1 stated that another gang member, Kevin McKinney, told him that Aaron Boone later shot Clark in the back of the head.

262.   Subsequent events make clear that the QDAO viewed Witness #1 to be a credible witness.

263.   In January 1999, months before Mr. Bell's trial, the QDAO indicted Aaron Boone for Clark's murder—consistent with the information supplied by Witness #1 in DD5 288.

264.    Additional wrongfully withheld DD5s further corroborate DD5 288.

265.    In DD5 291, Witness #1 provides additional details regarding members of the Speedstick robbery gang, including their nicknames, addresses, appearance, and more—further bolstering his credibility and specifically identifying the likely murderers.

266.    In DD5 548, another member of the robbery ring identified as "Witness #2" told detectives in an interview that took place *at the Queens DA's Office* that Jamal Clark had told him "I'[]m tired of this shit." When Witness #2 asked Clark what he was tired of, Clark responded "that shit in Corona"—an apparent reference to the Astoria Boulevard Murders for which Mr. Bell was convicted.

267.    It is clear that Jamal Clark and the Boone twins—not George Bell—murdered Epstein and Davis and that police and QDAO knew it in 1997, but chose to withhold this information from George's defense team despite multiple specific requests.

268.    As Justice Zayas unequivocally found: "Under no circumstances could the prosecutors in these cases have reasonably believed that this information—which suggested that another group of perpetrators, with a history of armed robberies targeting large amounts of cash, was responsible for the Murders of Epstein and Davis and thus contradicted the People's theory of the case—was not favorable to Bell, Bolt, and Johnson and did not have to be disclosed." *Bell*, 71 Misc. 3d at 662.

269.    Making matters worse, the trial counsel for Robert Majors (one of the alleged Speedstick members charged with another neighborhood robbery along with Aaron Boone) was provided with a redacted, two-page copy of DD5 288 and a redacted copy of DD5 291 in the year 2000, one year after Mr. Bell's conviction.

270.    The copies that Majors's counsel received incredibly had all of the information that would have exonerated Mr. Bell either redacted or, in the case of DD5 288, with the third page containing information exculpating Mr. Bell missing in its entirety.

271.    In other words, the QDAO was well aware of Speedstick's involvement in Astoria Boulevard Murders by 1997 (per ADA Testagrossa's notes) and was in possession of these specific DD5s by at least 2000, and chose to suppress this clear evidence that Mr. Bell was innocent.[4]

272.    The information withheld from Mr. Bell's defense team was far from limited to these DD5s. Following the revelations of DD5 288, Mr. Bell's post-conviction attorneys at Wachtell Lipton Rosen & Katz approached the QDAO's newly-formed Conviction Integrity Unit ("CIU").

273.    CIU did a thorough re-investigation of Mr. Bell's conviction, which identified other exculpatory information that was in the possession of law enforcement, but had never been disclosed to Mr. Bell.

274.    All of this newly-discovered information either points to Speedstick gang as the culprits or evidences that Mr. Bell's confession was unreliable.

275.    The below documents were never produced to Mr. Bell before the CIU reinvestigation.

- DD5 548 (discussed above).

- The NYPD "all points bulletin" from before Mr. Bell's arrest which stated that the robbery ring were the lead suspects in the Murders.

---

[4] It is worth noting DD5 288 was uncovered only through the most fortuitous of circumstances. Robert Majors has maintained his innocence and, in connection with his challenges to his convictions, these DD5s were produced to his lawyer. Majors's lawyer happened to have been familiar with Mr. Bell's case, recognized the significance of these productions, and contacted Mr. Bell's counsel. But for the awareness and tenacity of Majors, his lawyers, and some sheer luck, George Bell would still be serving a life sentence for a crime he did not commit. Majors's conviction was vacated in 2020 after a state court found that the QDAO withheld *Brady* material in his case.

- Additional police reports reflecting similar modus operandi between the suspects in the Astoria Boulevard Murders and other recent robberies in Queens, including (1) the time of day the crime occurred; (2) the number of perpetrators; and (3) the manner in which the perpetrators forced entry into the business.

- A DD5 reflecting that just days before the murder, three or four men appeared to be casing Epstein's check cashing store and that one of them had a scar on the left side of his face near his lip in a horseshoe shape and a thin mustache. A photo of Jamal Clark from the time of the Murders reveals a scar and mustache matching this description.

- A DD5, authored by Defendant Brooks, memorializing an interview with Jamal Clark's girlfriend at the time of the Astoria Boulevard Murders that further corroborates Witness #1's claim that Clark was closely associated with the Boone twins and that he went to the Boones' club in South Carolina with them shortly after the murder. Upon information and belief, Defendant Brooks did not provide this information to the QDAO or, in the alternative, this information was not provided by prosecutors to the defense.

- Additional evidence corroborating that Boone murdered Jamal Clark, adding more credence to the statements of Witness # 1 regarding Clark and Boone's involvement in the Murders for which Mr. Bell was convicted.

- A DD5 memorializing the interview with a victim of the May 9, 1997 robbery of a Flushing, Queens business (see Paragraphs 199-201 above), stating that "Green Van which was occupied by a M/B wearing a Green Army Jacket and sitting in drivers side of Van." This description matches the description from a witness to the Murders who testified at Mr. Bell's trial that the shooter was wearing a "green army jacket."

- A DD5 reflecting that Bigweh told Witness #2 that he actually was not involved in the robbery and Murders (when his supposed involvement was the only thing leading the police to Mr. Bell in the first place).

- Records reflecting that Bigweh had attempted suicide in custody and then needed mental health evaluations.[5] The QDAO had "obtained medical records related to the suicide attempt, which included information that Bigweh had a history of experiencing 'AH [auditory hallucinations]' of his dead mother at stressful times like his birthday or hers or the anniversary of her death. The voice tells him to 'go home.'" *Bell*, 71 Misc. 3d at 650. "None of these records, which were in the District Attorney's file related to this case, were disclosed to the attorneys representing Bell, Bolt, and Johnson, despite

---

[5] The subpoena seeking Bigweh's medical records was signed by ADA Neal Morse—one of the same ADAs who swore under oath on multiple occasions that "the Queens DA are not in possession of, or aware of, any *Brady* material."

specific requests for information of this sort having been made." *Id.* These records included handwritten notes with the name "Greg Lasak"—the lead prosecutor in Mr. Bell's case up until trial and a member of the QDAO capital case committee—at the top of the page recording that Bigweh had been sent for a psychiatric evaluation.

- Bigweh's cooperation agreement that was terminated shortly before Mr. Bell's trial, even though Mr. Bell's defense team had specifically requested any such cooperation agreements.

- A DD5 describing an interview with witness Altagralia Durna, who described the getaway car as a light blue Aerostar van with white stripes and who identified the stolen blue Ford Aerostar van recovered near the crime scene as the likely getaway vehicle. Incredibly, the QDAO did not disclose to Mr. Bell's defense team that this witness existed until two-and-a-half months after his trial began and the day after the witness had left the country, and even when disclosing her still did not disclose the DD5 reflecting the interview in which she identified the blue van recovered by the police as the getaway vehicle. Mr. Bell stated that the van was burgundy in  his false confession.

- During the same undisclosed interview, Ms. Duran also described the assailant as "light skinned male black or Hispanic." None of Mr. Bell, Johnson, or Bolt meet that description;.

- Interviews with an additional five eyewitnesses identifying the color of the van as either blue or green. Two of the witnesses also identified the van as having either North Carolina or South Carolina plates—further tying the crime to the Boone twins, who owned a night club in South Carolina.

- The DD5 from an interview with a man named Dennis Knight days before Mr. Bell was arrested in which Knight stated that he had "no specific information" of the crime but had a hunch that he knew named Devon might have been involved in the Murders and that Devon "usually drives a red or burgundy Plymouth Voyager van" (i.e., the source of the "burgundy" van information—corroborated by none of the eight eyewitnesses who gave statements to the police—fed to Mr. Bell by the police).

276.    The CIU investigation also uncovered a DD5 63, dated March 28, 1997, reflecting that just three weeks after Jamal Clark's murder, Queens Homicide Detectives supplied information regarding Clark's murder to Defendants Pia and Sica.

277.    This coordination between the detectives investigating Clark's murder and Defendants Pia and Sica—who were investigating the murder with which Mr. Bell was

39

charged—further demonstrate that these cases were always related and the investigating detectives were well-aware of the alternative suspects.

278.     The information in this DD5 and its clear implication that the police knew about the relationship between Speedstick and the murder for which Mr. Bell was convicted was also confirmed during CIU's reinvestigation.

279.     One of the lead detectives in the Speedstick investigation, Detective Stacey Calantjis, confirmed he and the other Speedstick investigators shared everything they uncovered about Speedstick with Defendants Pia and Sica.

280.     Calantjis also confirmed that he provided all of the information he had to Defendant Pia and Sica's boss, Defendant Nevins, but that Nevins did not pursue any of the leads regarding Speedstick's involvement.

281.     Defendants Nevins, Pia, and Sica did not provide this information to the QDAO or, in the alternative, prosecutors wrongfully withheld this information from Mr. Bell's defense team.

282.     The CIU reinvestigation also revealed that Defendant Bubelnik fabricated evidence against Mr. Bell.

283.     In May 1997, Detective Bubelnik drafted a DD5 575 regarding an interview with Rodney Boone (no relation to the Boone twins). Detective Bubelnik stated that Mr. Boone (1) informed her that she "had the right people"; (2) told her that the "word on the street" was that Rohan Bolt supplied the guns and got them in Brooklyn; and (3) identified Jason Ligon as a participant in the crime.

284.     Rodney Boone was interviewed as part of the CIU investigation and vigorously denied making any of these statements. Mr. Boone told investigators that he never told the police

they had the right people, never told police anything about Bolt who Boone only knew of because he owned a local restaurant, and never identified Ligon, who he had no basis to believe had any involvement in the crime.

285.    Instead, Mr. Rodney Boone told investigators that Defendant Bubelnik said to him "we have the right people," a statement which Mr. Boone did not confirm or deny since he had no knowledge of who committed in the crime.

286.    Defendant Bubelnik fabricated this DD5 claiming that Mr. Boone told her that they "have the right people."

287.    In addition to the voluminous documents discussed above reflecting Mr. Bell's innocence, the CIU also produced the handwritten notes of ADA Charles Testagrossa.

288.    These notes taken *before* Mr. Bell's trial in a folder labeled "Speedstick" reveal that as early as 1997 Testagrossa "[b]elieve[d] Jamal was driver in Davis homicide"; "Jason was Jamal"; and knew of "Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark 'Jason.'"

289.    As Justice Zayas put it, "[i]t is . . . mindboggling that Testagrossa asserted in open court that there was no link between the Boone-led Speedstick gang and this case." *Bell*, 71 Misc. 3d at 662.

290.    Even if Testagrossa had forgotten about his conversations with Defendant Heider by the time Mr. Bell went to trial in 1999, they were readily available to him throughout the trial. Rather than consult his own notes of the relationship between the cases when Mr. Bell's defense team sought to call Heider to testify, Testagrossa, in consultation with Defendant Heider, made blanket assertions that there was no connection between the cases and impugned the defendants' counsel for implying otherwise.

291.    Testagrossa not only failed to consult his notes, he doubled down on the supposed lack of any other suspects in his closing argument at Mr. Bell's trial, stating that Mr. Bell's defense lawyers were "despicable" for suggesting that others had committed the crime.

292.    The truth has now come out, and the true "despicable" actors in this saga were the NYPD and the QDAO.

293.    ADA Brad Leventhal likewise used this withheld *Brady* information to denigrate Mr. Bell's defense team.

294.    As set forth above, during Mr. Bell's trial, his defense team sought a subpoena to review ballistics analysis comparing the evidence from the May 1997 armed car robbery to that of the Astoria Boulevard Murders.

295.     Prosecutors claimed to have no knowledge of why this ballistics comparison was run, and Leventhal shamelessly argued that Mr. Bell's lawyers were on a desperate "fishing expedition."

296.    Lastly, it also was not until after Mr. Bell's conviction that the NYPD admitted that Jason Ligon's confession was false.

297.    As set forth above, there is clear evidence that Defendants Bubelnik and Bovino had knowledge of Ligon's solid alibi (that he was in Washington, D.C. at the time the Astoria Boulevard Murders were committed) before Mr. Bell's trial even began, and knew his confession was false, yet charges against Ligon deliberately were not dropped until Mr. Bell and his two co-defendants (Johnson and Bolt) had been convicted.

298.    Moreover, additional documents only recently disclosed reflect that police were investigating Clark as early as March 1997, when Defendants Bovino and Bubelnik did a "complete workup" of Jamal Clark and obtained numerous photographs of Clark. Defendant Sica

then placed a picture of Clark in a photo array with pictures of Mr. Bell, Bolt, Johnson, and Bigweh to at least one witness.

299.     Even though Defendants Pia, Sica, Bubelnik, and Bovino had had been actively investigating Jamal Clark, upon information and belief, once law enforcement learned Jason Ligon was in Washington, D.C. at the time of the murder, the NYPD made no further attempt to locate "Jason"—the supposed fifth participant in the murder of an off-duty police officer—because they knew that the real "Jason," *i.e.*, Jamal Clark, was deceased. This underscores that the police knew that the person they had previously identified as "Jason" was Jamal Clark, who was deceased.

300.     In other words, Defendants Pia, Sica, Bubelnik, and Bovino, in addition to Defendant Heider, not only knew and withheld that Jason Ligon was innocent, but also withheld from Mr. Bell their apparent knowledge that they had identified Jamal Clark, a deceased member of the Speedstick gang, as a participant in the murder. Clark's inclusion would have unquestionably warranted further investigation into Speedstick's involvement in the crime.

301.     These facts create the inescapable inference that Defendants Pia, Sica, Bubelnik, Bovino, and Heider stopped their own investigation into Clark once he was deceased in order to avoid implicating Speedstick and establishing that Messrs. Bell, Bolt, and Johnson were innocent.

***Mr. Bell's Conviction is Vacated***

302.     Armed with this trove of newly discovered evidence, the QDAO, through its Conviction Integrity Unit, together with Mr. Bell and his co-defendants jointly moved to vacate the convictions in March 2021.

303.    Justice Zayas granted the motion on March 5, 2021 (amended March 8, 2021) and excoriated the law enforcement officials involved in the process.

304.    While the QDAO joined Mr. Bell's request that his conviction be vacated, the office took the position that the withholding of *Brady* material was a good-faith mistake.

305.    Justice Zayas found the People's assertion of good faith "puzzling" and concluded that government's handling of the case "leaves the distinct impression that the suppression of the Speedstick information was not an isolated instance of misconduct, but part *of a larger pattern of behavior* that was calculated to deprive the defendants of fair trials." *Bell*, 71 Misc. 3d at 664-65 (emphasis added).

306.    Justice Zayas elaborated that law enforcement's conduct in this case was particularly "egregious given that the death penalty was being sought against 19-year-old George Bell."

307.    Justice Zayas emphasized that the "stakes could not have been higher" with the People seeking the death penalty against Mr. Bell but that the prosecution nonetheless "completely abdicated its truth-seeking role." *Bell*, 71 Misc. 3d at 659.

308.    In addition to his finding of clear prosecutorial misconduct, Justice Zayas noted that that the circumstances surrounding Mr. Bell's confession and the contents thereof "raise legitimate concerns about [its] reliability" and that the rest of the People's case against Mr. Bell was "far from iron clad." *Id.* at 663.

309.    On June 4, 2021, Mr. Bell's indictment was dismissed with prejudice upon motion by the QDAO on newly discovered evidence grounds and all charges were dropped.

310.    In announcing the decision to seek to dismiss the indictment, the QDAO explained that between March and June of 2021, it had "conducted an extensive and exhaustive

investigation" in which it: (1) reviewed all relevant documentary evidence, including both documents related to Mr. Bell's case and the files of numerous other NYPD investigations of the alternate suspects in this case; (2) interviewed of over 60 fact witnesses; (3) reviewed "hundreds and hundreds" of hours electronic evidence; and (4) reviewed "hundreds of hours" of forensic testing involving DNA evidence, ballistics evidence and the re-testing of fingerprint evidence.

311.    This thorough investigation *did not turn up a shred of evidence implicating George Bell.*

312.    After twenty-four years behind bars, Mr. Bell could finally re-enter free society and at the age of 44.[6]

**The Unconstitutional Policies and Practices of the Queens DA**

313.    The misconduct of the QDAO in Mr. Bell's case was not the result of one-off bad actors but of office-wide policies and practices that encouraged *Brady* violations as a means of securing convictions.

314.    These practices routinely deprived criminal defendants of their fair trial rights.

315.    These practices were employed in Mr. Bell's case and cost him twenty-four years of his life.

316.    There are two unlawful practices of the QDAO office that significantly contributed to Mr. Bell's conviction.

317.    First, upon information and belief, the QDAO had no effective mechanism for prosecutors to obtain *Brady* information known to other QDAO prosecutors in their office. This

---

[6]Although Mr. Bell's conviction was not vacated until the police and the DA's misconduct was exposed, Mr. Bell never stopped fighting for his innocence over 24 years of incarceration. *See People v. Bell*, 307 A.D.2d 1047 (2d Dep't 2003); *People v. Bell*, 1 N.Y.3d 568; *Bell v. Ercole*, No. 05 Civ. 4532 , 2008 WL 2484585 (E.D.N.Y. June 20, 2008); *Bell v. Ercole*, 368 F. App'x 216 (2d Cir. 2010); *Bel v. Ercole*, No. 05 Civ. 4532 E, 2011 WL 5040436 (E.D.N.Y. Oct. 21, 2011); *Bell v. Ercole*, 471 F. App'x 17 (2d Cir. 2012); *Bell v. Lee*, 568 U.S. 866 (2012).

practice made it easy for prosecutors disinterested in satisfying their *Brady* obligations to have "plausible deniability" that they were not aware of exculpatory materials.

318.     Under governing Supreme Court precedent, a prosecutor "has a duty to learn of any favorable evidence known to others in the prosecutor's office, as well as others acting on the government's behalf, including the police." *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995)

319.     Yet, the QDAO had no effective mechanism for prosecutors to access information known to others in the prosecutor's office. As a result, an ADA attempting to locate materials related to a particular topic or investigation could not easily do so.

320.     QDAO provided no training to prosecutors on how to locate *Brady* material known to other prosecutors in the office.

321.     QDAO policies and procedures inhibited prosecutors from learning of "favorable evidence known to others in the prosecutor's office."

322.     This case presents a stark example of how this grossly deficient and constitutionally infirm method of information storage would lead to the violation of criminal defendants' Constitutional rights.

323.     Based on the information he developed while reinvestigating Mr. Bell's case, CIU Director Bryce Benjet stated that "significant" Brady material connecting Speedstick to the Murders was "not contained in the files of these defendants [Messrs. Bell, Bolt and Johnson]."

324.     As a result, ADAs Fidel, Dorfman, and Morse could falsely claim that the QDAO did not have exculpatory files documenting Speedstick's involvement in the crime at the time that they responded to Plaintiff's requests for *Brady* material.

325.     Because this *Brady* information known to other prosecutors was not properly stored and/or not sufficiently accessible, Mr. Benjet concluded that the trial prosecutors' denials of the existence of such *Brady* materials were made "in good faith."

326.     In short, the ADAs responding to Mr. Bell's discovery requests did not have ready access to those files and there was no policy, practice, or training for how these attorneys would obtain and review other prosecutors' files.

327.     This policy failure does not excuse the prosecutors' misconduct. Mr. Bell's counsel cited to specific newspaper reports indicating that Speedstick members were suspects and Mr. Dorfman, Mr. Fidel, and Mr. Morse should have sought out materials, wherever located, relating to that subject matter.

328.     Moreover, Testagrossa was aware of Jamal Clark's involvement in the murder two years earlier and, given the notoriety of Mr. Bell's alleged crime, it is inconceivable that he did not check his prior notes, or review any files related to Jamal Clark at all, before issuing false denials of the relationship between the cases in open court and calling Mr. Bell's defense team "despicable" for attempting to tie the two cases together.

329.     This lack of any mechanism (or training) for prosecutors to access other prosecutors' files enabled an "ostrich" approach to *Brady* obligations, where prosecutors could claim not to have seen exculpatory materials. This is exactly such a case. It is not plausible that the revelation that Speedstick was involved in the Astoria Boulevard Murders in 1997 would have just been glossed over. This case was notorious. It involved the murder of a police officer, was the only death penalty case in the office, and defense counsel (and the press) specifically probed the relationship between Speedstick, the Astoria Boulevard Murders, and the Flushing attack.

330.     Nevertheless, because this information was not stored in the case files, the ADAs running discovery in Mr. Bell's case could simply avoid this information.

331.     The QDAO's policy, practice, and procedure of failing to have an effective mechanism for prosecutors to access information known to others in the prosecutor's office made it foreseeable to Defendant City of New York that prosecutors would not locate *Brady* material and thus would withhold *Brady* material from criminal defendants.

332.     This unlawful policy, practice, or custom of Defendant City of New York was a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

333.     Second, the QDAO as delegee of the Defendant City of New York had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for misconduct, including frequent *Brady* violations.

334.     This custom and practice encouraged, condoned, and ratified the prosecutors' deliberate and reckless disregard of their constitutional and ethical duties.

335.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final authority and is the City's policymaker in the training, instructing, supervising and disciplining of attorneys.

336.     The District Attorney of Queens County, Richard Brown, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

337.     In the years before and during Mr. Bell's conviction, the Queens County District Attorney's office, under Mr. Brown and his predecessor, John Santucci, had an extensive history

of prosecutorial misconduct that caused constitutional violations, including, *inter alia*, *Brady* violations and knowing reliance on false testimony and argument and the failure to correct the same.

338.     The leadership of the QDAO knew that even a single instance of prosecutorial misconduct, if it led to no discipline, could poison the atmosphere of the entire office, as Acting District Attorney John Ryan acknowledged during a sworn deposition in another prosecutorial misconduct matter. Mr. Ryan also acknowledged the dire consequences inflicted on those who wrongfully convicted and agreed that "such dire consequences to others justify dire consequences to prosecutors who act unethically."

339.     In early 1996, the executive leadership of the QDAO compiled a Prosecutorial Misconduct Survey (the "Survey").

340.     As the City confirmed in a Fed. R. Civ. P. 30(b)(6) deposition on December 1, 2020 in another matter, the Survey found that, in at least *39* cases, either an appellate court held that the QDAO committed misconduct (22 cases), or the QDAO admitted misconduct absent such a finding (17 cases).

341.     The QDAO's prosecutorial misconduct in the Survey included all of the above types of prosecutorial misconduct resulting in constitutional violations, including *Brady* and related discovery violations, summation misconduct, improper reliance on false evidence, and prejudicial degradation of criminal defendants.

342.     The instances of misconduct covered by the Survey constituted just a fraction of the total instances of misconduct the QDAO had committed between 1988 and 1995 and also did not include numerous additional incidences between 1985 and 1988, when Richard Brown was

an appellate division justice and became aware of the pervasiveness of prosecutorial misconduct in the QDAO.

343.     All, or substantially all, of the QDAO prosecutorial misconduct cited in the Survey occurred in the few years preceding Mr. Bell's arrest, trial, and conviction.

344.     By way of example, the Survey cited the following cases, which represent a small sample of the misconduct found in the Survey:

A.     *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992), ordering a new trial where the QDAO prosecutor's summation "went well beyond the bounds of fair advocacy," including suggesting that defendant's alibi was concocted after the witness met with defense counsel.

B.     *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993), reversing a defendant's manslaughter conviction where the QDAO made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a QDAO supervisor would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement.

C.     *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994), reversing a conviction where the QDAO withheld potential impeachment material, suggested without evidence that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic, comments that "went beyond the permissible bounds of broad rhetorical comment and should not be repeated at a new trial."

D.     *People v. Montesa*, 211 A.D.2d 648 (2d Dep't 1995), reversing a conviction in part because the QDAO prosecutor elicited hearsay testimony from a witness and committed summation misconduct.

E.     *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995), reversing a conviction where a QDAO prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

F.     *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995), ordering a new trial where the QDAO's misconduct was "so flagrant and so pervasive that it was impossible for the defendant to receive a fair trial," including repeatedly referring to defendant as a convicted felon to convict him based on criminal propensity, and attempting to shift the burden of proof.

G.     *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995), reversing a conviction in part based on the QDAO prosecutor's disregard of the court's ruling limiting unfairly prejudicial evidence, cross–examination questions comparing defendant to Hannibal Lecter in *Silence of the Lambs*, and waving of a knife in front of the jury during summation.

H.      *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995), reversing a conviction due to serial misconduct by the QDAO prosecutor.

I.      *People v. James*, 218 A.D.2d 709 (2d Dep't 1995), noting "unacceptable practices engaged in by the [QDAO] prosecutor."

J.      *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994), reversing a conviction in part based on QDAO summation misconduct and reliance on unduly prejudicial evidence.

345.    Despite the serial misconduct that the Survey revealed, the City has admitted that the QDAO:

A.      Failed to change any QDAO policy;

B.      Failed to change any QDAO practice;

C.      Failed to change any QDAO procedure;

D.      Failed to discipline any QDAO prosecutor;

E.      Failed to change its disciplinary process for QDAO prosecutors (in fact, there was no process);

F.      Failed to identify which prosecutors committed the misconduct in the Survey;

G.      Failed to incorporate prosecutorial misconduct, including but not limited to court findings of prosecutorial misconduct, into employment evaluations of QDAO prosecutors;

H.      Failed to make any changes to the way prosecutors were evaluated;

I.      Failed to make any changes to the way prosecutors were supervised;

J.      Failed to create additional oversight by upper-level executives in the office;

K.      Failed to change any hiring practices for QDAO prosecutors;

L.      Failed even to inform trial QDAO prosecutors about the results of the Survey;

M.      Also failed to inform appellate QDAO prosecutors about the results of the Survey;

N.      Failed to have any office-wide meeting to discuss the Survey or response to the Survey;

O.      Failed to track QDAO prosecutorial misconduct post-Survey;

P.      Failed to analyze QDAO prosecutorial misconduct, by type, by prosecutor, or by any other method; and

Q.      Failed to do any follow-up prosecutorial misconduct survey.

346.    For his part, District Attorney Brown took no action at all in response to the Survey.

347.    Chief Assistant District Attorney Barry Schwartz was Brown's number two in the QDAO, and was delegated responsibility, *inter alia*, for discipline, promotions, and other supervision and personnel matters.

348.    Schwartz has no memory of the Survey or of almost any case cited in the Survey. Schwartz has stated in sworn deposition testimony that he has no memory of the QDAO "taking any kind of action in response" to the Survey.

349.    The QDAO's leadership in 1996 included Brown, Schwartz, and Chief of Appeals Steven Chananie. John Ryan replaced Schwartz as Chief Assistant in 1997 and remained in that role through Bell's conviction in 2002.

350.    All of them failed to take any of the above steps in response to the Survey.

351.    Nothing in the Survey surprised or could have surprised the QDAO's leadership. From the beginning of his tenure in 1991, Brown routinely read appellate decisions in QDAO cases. Barry Schwartz also routinely read those cases, as did Chananie. Schwartz also read QDAO reversal memos that summarized the disposition and reasoning of those cases. Those cases formed the basis for the results of the Survey.

352.    Throughout his tenure, from 1991 through the Bell trial and after, District Attorney Brown knew about prosecutorial misconduct by QDAO prosecutors.

353.    Brown and Schwartz purportedly "expressed concern" to each other "about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.'"

354.    Yet neither took any systemic action to address, prevent, or punish prosecutorial misconduct in the QDAO.

355.    As damning as the Survey was, it contained a woefully incomplete summary of QDAO prosecutorial misconduct in the early 1990s.

356.    A number of prosecutors apparently failed to respond to the Survey, and the Survey missed recent misconduct of a number of prosecutors who had recently left the QDAO.

357.    As a result, at least *19* decisions (almost all appellate cases) *not* reflected in the survey found additional prosecutorial misconduct by the QDAO between 1991 and 1995 ("Additional Misconduct").

358.    The QDAO, including Brown and Schwartz, read and knew about these decisions, all of which were filed and available to the general public.

359.    The Additional Misconduct cited in these decisions was wide ranging, including *Brady* and *Rosario* violations, improper cross-examination, violation of court orders, summation misconduct, improperly eliciting evidence at trial, and improperly coaching a People's witness at trial.

360.    Decisions reflecting Additional Misconduct include, but are not limited to:

A.    *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991), reversing a conviction in part based on the QDAO prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that sodomy had occurred.

B.    *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana, in "a deliberate and calculated strategy to convict on the basis of improper and prejudicial hyperbole."

C.    *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor failed to disclose the videotape of an interview of the alleged child victim.

D.      *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991), ordering a new trial in part based on the QDAO prosecutor's summation misconduct.

E.      *People v. Curry,* 153 Misc.2d 61 (Sup. Ct. Queens Cty. Jan. 16, 1992), dismissing the indictment because the QDAO prosecutor failed to inform the grand jury that the complainant had recanted his identification and report of defendant's involvement in the crime.

F.      *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992), reversing a rape conviction where, despite a court order, the QDAO prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

G.      *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor engaged in improper cross-examination and summation.

H.      *People v. James*, 184 A.D.2d 582 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor represented that the People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs, but then cross-examined a police officer extensively on that evidence and emphasized it in summation.

I.      *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992), reversing a conviction in part because of the QDAO prosecutor's summation misconduct.

J.      *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992), ordering a new trial where the QDAO prosecutor repeatedly and improperly elicited evidence of uncharged crimes to show criminal propensity and bad character, and committed summation misconduct.

K.      *People v. Banch*, 80 N.Y.2d 610 (1992), reversing a conviction where the QDAO prosecutor failed to disclose several pieces of potential impeachment material, and noting "the People's seeming lack of care in discharging their discovery obligation."

L.      *People v. Jenkins*, Ind. No. 2213/1992, declaring a mistrial "based on [QDAO] ADA Landa's 'prosecutorial misconduct'" in 'hold[ing] back exculpatory information as long as possible' from defense counsel."

M.      *People v. Robinson*, 190 A.D.2d 697 (2d Dep't 1993), setting aside the verdict because the QDAO "prosecutor's misconduct deprived [defendant] of a fair trial," including "prepp[ing]" an officer during a recess to "rehabilitate him on his cross-examination," and committing summation misconduct.

N.      *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993), ordering a new trial where the QDAO prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest silence, committing summation misconduct, eliciting improper expert testimony, and "derisive[ly]" commenting on the presumption of innocence.

O.      *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994), reversing a conviction where the QDAO failed to disclose potential impeachment evidence.

P.    *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995), faulting the QDAO for failing to disclose potential impeachment evidence.

361.   The QDAO's failure to include any of the Additional Misconduct in the Survey is further evidence of deliberate indifference to prosecutorial misconduct in the office.

362.   In response to the Additional Misconduct, the QDAO:

A.    Failed to change any QDAO policy;

B.    Failed to change any QDAO practice;

C.    Failed to change any QDAO procedure;

D.    Failed to discipline any QDAO prosecutor; and

E.    Failed to implement any new training.

363.   After yet another reversal due to a finding of prosecutorial misconduct District Attorney Brown wrote a note to his Chief Assistant, Jack Ryan, stating: "Jack – Let's discuss how to handle – I think we've been getting away with this kind of stuff for a long time."

364.   Notwithstanding rampant, wide-ranging prosecutorial misconduct in the QDAO, from at least June 1991 through January 1997 (Barry Schwartz's tenure as Chief Assistant), and continuing the following five years through January 2002 (under his successor, John Ryan), and DA Brown's acknowledgement that the office had been "getting away with this kind of stuff for a long time," the QDAO still:

A.    Failed to discipline a single QDAO prosecutor for prosecutorial misconduct;

B.    Failed to create a handbook or manual setting forth rules and procedures for prosecutors, including how to comply with their constitutional obligations;

C.    Per Schwartz' sworn testimony, had "no procedure in place" for "investigating prosecutorial misconduct of any type";

D.    Failed to note prosecutorial misconduct in an employment evaluation;

E.      Failed to have any practice or procedure to note prosecutorial misconduct in a

        personnel file;

F.      Had no policy, practice, or procedure to use reversal memos as part of

        employment evaluations;

G.      Failed to create any practice, policy or procedure to ensure that supervisors were

        aware of findings of prosecutorial impropriety;

H.      Failed to create any practice, policy or procedure to make Schwartz, Brown, or

        Ryan aware of misconduct by prosecutors before promoting them or increasing

        their compensation;

I.      Failed to include reversal memos, appellate decisions, or any document that might

        reflect prosecutorial misconduct in the packets compiled before Schwartz or Ryan

        recommended a promotion;

J.      Failed to keep records of findings of misconduct by individual prosecutor, by

        bureau, or by the Office as a whole;

K.      Failed to conduct any review of QDAO prosecutorial misconduct before June

        199; and

L.      Failed to do any trend analysis of prosecutorial misconduct over time.

365.    In addition to the approximately *58* cases of prosecutorial misconduct set forth

*supra*, in opinions dated 1996, 1997, and after, courts repeatedly assailed the QDAO for yet

more prosecutorial misconduct that occurred before Mr. Bell's conviction, yet there was no

adverse consequence to the prosecutors who were responsible and no change in office policy,

practice or procedure to prevent still more such occurrences in the future.

366.    This misconduct included *Rosario* violations, *Brady* violations, suborning false testimony, and improper opening statements.

367.    Some examples illustrate how the QDAO created an office culture where prosecutorial misconduct was ignored, condoned, and rewarded.

**Prosecutor A.[7]**

368.    In 1990, QDAO prosecutor A. prosecuted Robin Tellier. A. (i) failed to disclose *Rosario* material; (ii) failed to disclose *Giglio* material; (iii) misrepresented to defense counsel that all *Brady* and *Rosario* material had been disclosed; (iv) misrepresented to the court whether federal prosecutors who had debriefed a People's witness were observing the trial; and (v) allowed a People's witness to claim a loss of memory concerning prior crimes, when information concerning those crimes was contained in the debriefing notes A. had failed to disclose.

369.    The Grievance Committee for the Ninth Judicial District later admonished A. for concealing the notes, for a "misrepresentation" to the court, and for engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

370.    On October 1, 1991, the QDAO nevertheless gave A. an "Excellent" evaluation, noting: "This Assistant likes to win and fights towards that end."

371.    On May 1, 1992, the QDAO gave A. a "Very Good" evaluation, stating that A. "is a true warrior in that he never backs down or is intimidated."

372.    Neither evaluation mentioned the *Tellier* case, or A.'s unethical and illegal conduct in that case.

---

[7] Prosecutors here are identified by the first initial of their last name.

373.    On March 29, 1993, the Second Department found in *People v. Kane* that A. improperly in opening and closing arguments "impl[ied] the defendant's guilt of an unrelated burglary."

374.    On September 1, 1993, the QDAO's Dan Saunders gave A. an "Outstanding" evaluation, noting that A. "acquitted himself well with *every* assignment he's undertaken" and that "[h]is judgment, temperament and advocacy skills are all outstanding." (Emphasis added.)

375.    Saunders was then the Chief of Homicide Trials at the QDAO.

376.    Saunders' 1993 evaluation failed to mention the *Tellier* or the *Kane* cases, or A.'s improper conduct in both.

377.    On February 2, 1995, the Queens Supreme Court granted a motion to vacate a conviction in *People v. Moustakis*, a decision later affirmed by the Second Department. A. prosecuted that case. The courts found that A. "fail[ed] to turn over 16 pages of notes of detailed admissions by a prosecution witness concerning his prior criminal history," details of which the witness "forgot" on the stand.

378.    On August 28, 1995, a few months after the first *Moustakis* decision, Schwartz announced to "the Entire Staff" A.'s promotion to Deputy Bureau Chief of the Supreme Court Long Island City Bureau. There, A. supervised 10-11 prosecutors.

379.    Per his regular practice at the QDAO, Schwartz promoted A. "in consultation with the district attorney," Mr. Brown.

380.    About two weeks later, on September 15, 1995, in a decision following a March 31, 1995 argument, the Second Department reversed the conviction in *People v. Spinelli*. A. prosecuted *Spinelli*. The Court found that A. improperly cross-examined an officer about the

defendant's pretrial silence, engaged in summation misconduct, and held that "the prosecutor's conduct was fundamentally unfair."

381.    This decision also had no effect on A.'s promotion or, on information and belief, A.'s career at the QDAO.

**Prosecutor B.**

382.    On December 13, 1993, Brown promoted QDAO prosecutor B. to Deputy Chief of the Supreme Court Kew Gardens Bureau.

383.    On August 22, 1994, the Second Department reversed the conviction in *People v. Elder*. B. prosecuted *Elder*. The Court found that B. engaged in "flagrant" "instances of prosecutorial misconduct," in particular, summation misconduct, which "substantially prejudiced defendant's case."

384.    Notwithstanding B.'s flagrant misconduct, B. did not receive any discipline, any adverse consequence, or any new training.

385.    To the contrary, on April 27, 1995, Schwartz announced to "the Entire Staff" B.'s promotion to Chief of the Intake Bureau.

386.    There, B. supervised intake for the entire QDAO.

**Prosecutor D.**

387.    On September 26 1994, the Second Department held in *People v. Fanfan* that the QDAO "exceeded the bounds of a proper summation." D. prosecuted *Fanfan*.

388.    On May 15, 1995, the Second Department reversed the conviction in *People v. Moss*. D. prosecuted *Moss*. The Court founds that D. (i) compared the defendant to Hannibal Lecter in the film *Silence of the Lambs* during cross-examination of the defendant; (ii) asked the jury in summation to "place themselves in the position of victims being threatened by the

defendant"; (iii) disregarded the Court's *Sandoval* ruling; and (iv) waved a knife during summation.

389.    Surely a prosecutor like this would be fired, or at least disciplined, in any district attorney's office that cared about prosecutorial misconduct.

390.    Not the QDAO. On August 25, 1996, Schwartz announced to "the Entire Staff" D.'s promotion to Supervisor of the *Training* Bureau.

391.    There, fresh off comparing a defendant to Hannibal Lecter and waving a knife in front of the jury, D. taught prosecutors at the QDAO how to prepare and try cases.

392.    D. himself received no discipline or further training as a result of *Fanfan* or *Moss*.

**Prosecutor K.**

393.    On June 10, 1991, the Second Department reversed the conviction in *People v. Stevens*. K. prosecuted *Stevens*. As noted *supra*, the Court found that K. improperly stated in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that an act of sodomy had occurred.

394.    In July 1991, Chief of Training Andrew Zwerling and Schwartz made K. a co-supervisor of the new QDAO Training Bureau. There, she trained prosecutors in all aspects of trial practice.

395.    On August 31, 1992, the Second Department reversed the conviction in *People v. Clausell*. K. prosecuted *Clausell*. The Court found that K. (i) failed to produce *Brady* material; (ii) before opening statements, misrepresented to the trial court and to defense counsel that the *Brady* material did not exist; (iii) after an officer's testimony, again mispresented to the trial court that the *Brady* material did not exist; and (iv) again failed to produce the *Brady* material.

396.    The defense then subpoenaed the material from the police department and received it, nine days after the conviction.

397.    After K.'s serial misconduct in *Clausell*, and notwithstanding that K. was a supervisor in the Training Bureau, the QDAO did not discipline her, give her any additional training, place a note in her evaluation or personnel file, or apparently take any other action.

398.    To the contrary, the QDAO gave K. twelve salary increases, three bonuses, and in 1997 promoted her, again, to become a Bureau Chief.

### Prosecutor L.

399.    On February 29, 1988, the Second Department reversed the conviction in *People v. Romain*. L. prosecuted *Romain*. The Court found that L. engaged in "gross distortion" in summation, "the magnitude of which was highly prejudicial."

400.    In May 1994, in the case of *People v. Moore*, L. questioned several witnesses about prohibited evidence (pending and other prior crimes), then compounded the misconduct by summing up on the prohibited evidence.

401.    On May 15, 1996, a QDAO executive (John Ryan) wrote Chief of Appeals Steven Chananie, Schwartz, and Andrew Zwerling a memo that L. "did engage in misconduct," which "we did not defend in our [appellate] brief."

402.    Ryan also wrote that the Second Department "*once again*, expressed their own concerns about the issue" of the QDAO's "prosecutorial misconduct." (Emphasis added.)

403.    The memo also noted Brown's "continuing concern about prosecutorial misconduct" in the QDAO.

404.    Nevertheless, after this memo, the QDAO gave L. five salary increases, one bonus, and a promotion to Intake Supervisor.

405.    QDAO prosecutors A., B., D., K., and L. are merely a few examples of QDAO prosecutors who violated the Constitution in the years leading to Mr. Bell's conviction and immediately following it, faced no adverse action, received no further training or supervision, and continued to thrive and progress in the office.

406.    While additional training and discipline for misconduct was virtually non-existent, ADA Testagrossa himself has testified at a deposition in another matter that prosecutors in the QDAO's office at the time kept close tally of their trial win-loss records. He also stated he perceived that their victory percentage affected their promotions and compensation.

407.    In sum, policymakers at the QDAO's office created a culture where winning mattered more than following the Constitution. They acted with deliberate indifference to constitutional violations generally, based on policy and practice, including those that injured Plaintiff, and failed to take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish prosecutorial misconduct.[8]

408.    To the contrary, the deliberate indifference and policies and practices of QDAO policymakers, including the District Attorney and his designees, created a culture of prosecutorial misconduct that they knew was highly likely to cause further violations and which, in fact, did so in numerous cases, including Plaintiff's case.

409.    These policies and practices which condoned and encouraged the suppression of *Brady* material in the name of securing a conviction, (and, at a minimum ensured there would be

---

[8] *See also*  Michael Powell, *Misconduct by Prosecutors, Once Again*, N.Y. Times (Aug. 13, 2012), http://www.nytimes.com/2012/-8/14/nyregion/new-charge-of-prosecutorial-misconduct-inqueens.html (observing history of prosecutorial misconduct at the QDAO under then-DA Richard Brown and quoting Marvin Schechter, chairman of the criminal justice section of the New York State Bar Association, as saying "Assistant district attorneys do not emerge from law school with a genetic disposition" to hide *Brady* material. "Instead this is something which is learned and taught.").

no repercussion for prosecutors who did so) were a proximate cause of the constitutional violations of ADAs Lasak, Testagrossa, Leventhal, Cantoni, Dorfman, Morse, and Fidel set forth *supra*, which caused the conviction of Plaintiff.

410.    These prosecutors knew that the QDAO valued winning over following the Constitution (and all the more so when a police officer was killed and the Mayor was demanding swift punishment), and they were right, which caused the conviction of Plaintiff.

411.    The QDAO's policy, practice, and procedure of allowing prosecutors to commit prosecutorial misconduct in dozens of cases, without consequence, made it foreseeable to Defendant City of New York that prosecutors would commit misconduct in Mr. Bell's case, including withholding *Brady* material and then painting Mr. Bell's defense team as "despicable" and on a "fishing expedition" for trying to hold the prosecution to its Constitutional obligations.

412.    These unlawful policies, practices, and customs of Defendant City were a substantial factor in causing the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

***Mr. Bell Has Been Grievously Injured***

413.    Mr. Bell entered prison at the age of 19 and walked out at the age of 44. In that time, he lost the opportunity to finish school, pursue a career, develop personal relationships, and live a meaningful life. While Mr. Bell was incarcerated, he missed family celebrations which brough his close-knit family together—weddings, birthday parties, and baptisms, just to name a few. He also missed the opportunity to be with his family during difficult times. When Mr. Bell did attend the funeral of his grandmother who passed away while he was incarcerated, he was subject to degrading treatment as corrections officers used the grief-filled occasion to humiliate Mr. Bell in front of his loved ones.

414.    As a result of Defendants' conduct Mr. Bell suffered physical and mental injuries, loss of liberty, and economic harm. While waiting for his trial to begin, from the age of 19 to 22, Mr. Bell was detained at Rikers Island, desperate for law enforcement to recognize he was innocent and distraught over the false accusations. He faced the death penalty, and went to sleep each night knowing he might be murdered by the state for a crime he did not commit. Having escaped the death penalty, Mr. Bell then faced spending his whole life in prison, without even the possibility of parole. For 24 years he endured the atrocities of life in prison. He faced threats and derision from corrections officers who wrongfully believed he had murdered a cop and from fellow inmates who branded him a "rat" who had "snitched" on his supposed accomplice.

415.    While Mr. Bell is finally free, he will carry the trauma of false imprisonment and false accusations of murder for the rest of his life.

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 Claim for Violation of Mr. Bell's Right
Against Self-Incrimination and to a Fair Trial
(Against Defendants Pia and Sica )

416.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

417.    Defendants Pia and Sica, acting individually and in concert, coerced Mr. Bell into making incriminating statements against himself, fabricated evidence, and concealed material exculpatory and impeachment evidence thereby depriving Mr. Bell of his Fifth, Sixth, and Fourteenth Amendment rights to be free from self-incrimination and to be provided a fair trial.

418.    Specifically, Pia and Sica deliberately and recklessly coerced inculpatory statements from Mr. Bell through physical violence and intimidation which were not the product of Mr. Bell's free will and rational intellect, and supplied Mr. Bell with specific details of the crime which Mr. Bell subsequently incorporated and repeated in allegedly inculpatory statements.

419.     Defendants Pia and Sica falsely represented to prosecutors in police reports, in the course of charging and indicting Mr. Bell, and at trial, that Mr. Bell's statements were in fact freely and voluntarily given, and that Mr. Bell had independent knowledge of the crime that actually had been provided to him by the Defendants. The false evidence which Defendants Pia and Sica thereby fabricated was introduced against Mr. Bell at trial and was a basis for the jury's verdict against him.

420.     Defendants Pia and Sica did not disclose to prosecutors that they obtained Mr. Bell's confession through physical violence and mental coercion.

421.     Defendants Pia and Sica acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

422.     As a direct and proximate result of the Defendants' actions, Mr. Bell was wrongly prosecuted, convicted, and imprisoned over twenty-four years and suffered other grievous and continuing injuries and damages.

### SECOND CLAIM FOR RELIEF
42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due
Process of Law and Denial of a Fair Trial
(Against Defendants Pia, Sica, Heider, Bubelnik, Bovino, Cardamone, Brooks, and Nevins)

423.     Plaintiff realleges the above paragraphs as if they were fully set forth herein.

424.     The Individual Defendants, acting individually and in concert, fabricated evidence and  concealed material exculpatory and impeachment evidence thereby depriving Mr. Bell of his Fifth, Sixth, and Fourteenth Amendment rights.

425.     Defendant Sica fabricated a DD5 claiming that he had spoken to Mr. Bell after the initial false confession and that Mr. Bell had changed his statement to reflect that his friend Mendez Collier had not participated in the crime.

426.    Defendant Pia acted in concert with Defendant Sica and did not intervene when Defendant Sica created this falsified DD5.

427.    Defendants Sica and Pia falsely represented to prosecutors, in the course of charging and indicting Mr. Bell, and at trial, that this DD5 was accurate.

428.    This false evidence which Defendants Sica and Pia thereby fabricated was introduced against Mr. Bell at trial and was a basis for the jury's verdict against him

429.    Defendants Cardamone and Brooks deliberately and recklessly coerced and/or fabricated statements from Gary Johnson. These fabricated statements were provided to the QDAO and would have been likely to influence a jury's decision were the evidence to be presented a trial.

430.    Defendants Bubelnik and Bovino deliberately and recklessly coerced and/or fabricated statements from Jason Ligon. These fabricated statements were provided to the QDAO and would have been likely to influence a jury's decision were the evidence to be presented a trial.

431.    Upon information and belief, Defendant Heider affirmatively misled ADAs Testagrossa and Leventhal at trial by representing that the Speedstick investigation had no relation to the Astoria Boulevard Murders.

432.    Upon information and belief, the Individual Defendants knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Mr. Bell's defense. The suppressed evidence included but is not limited to:

   a.   That Defendants Pia, Sica, Heider, Bubelnik and Bovino were investigating Speedstick in connection with the Astoria Boulevard Murders, including investigating Jamal Clark;

   b.   That Jason Ligon's confession was coerced;

66

    c.    That Gary Johnson's confession was coerced;

    d.    That Defendants Bubelnik and Bovino had been sued on allegations that they had previously coerced a false confession (Defendants Bublenick and Bovino only); and

    e.    That Defendant Bubelnik falsified a DD5 claiming that a third-party had told her she "had the right people" (Defendants Bubelnik and Bovino only).

433.    Moreover, Defendants Pia, Sica, Heider, Bubelnik, and Bovino worked in concert deliberately to stop developing evidence that Jamal Clark was "Jason" and had participated in the Astoria Boulevard Murders in order to hide Speedstick's involvement and preserve the prosecution of Mr. Bell.

434.    If these fabrications and exculpatory and material impeachment evidence were known to Mr. Bell's defense team and had been documented and/or disclosed, such evidence would have tended to prove that Speedstick, not Mr. Bell, committed the Astoria Boulevard Murders and that Mr. Bell's confession was false, and cast doubt on the entire police investigation and prosecution.

435.    The aforesaid conduct, which Defendants committed, operated to deprive Mr. Bell of his rights under the Constitution and the laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

436.    As a direct and proximate result of the Defendants' actions, Mr. Bell was wrongly prosecuted, convicted, and imprisoned over twenty-four years and suffered other grievous and continuing injuries and damages.

### THIRD CLAIM FOR RELIEF
42 U.S.C. § 1983 Malicious Prosecution
(Against Defendants Pia and Sica)

437.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

438.    Defendants Pia and Sica, despite knowing that probable cause did not exist to arrest and prosecute Mr. Bell for the Murders, and though the grand jury's probable cause determination was vitiated by these Defendants' undisclosed misconduct, coerced confession, and fabrication of evidence, acted individually and in concert to cause Mr. Bell to be wrongfully arrested and prosecuted for those crimes.

439.    In signing the criminal complaint, Defendant Pia, acting in concert with Defendant Sica, lacked probable cause to initiate the prosecution of Mr. Bell and the indictment and conviction of Mr. Bell was procured by fraud, perjury and presentation of fabricated evidence.

440.    False and fabricated evidence was given by Defendants Pia and Sica to the prosecutor, the Grand Jury and the Petit Jury.

441.    Defendants Pia and Sica acted with malice, and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict and prosecute Mr. Bell.

442.    Defendants Pia and Sica prosecuted Mr. Bell though they knew the only compelling evidence against him was his confession, which they had coerced through physical violence and intimidation.

443.    The proceeding was terminated in Mr. Bell's favor when his conviction was vacated on March 5, 2021, and when the indictment was dismissed on June 4, 2021.

444.    In announcing the decision to seek to dismiss the indictment, the QDAO explained that between March and June of 2021, it had "conducted an extensive and exhaustive investigation" in which it: (1) reviewed all relevant documentary evidence, including both documents related to Mr. Bell's case and the files of numerous other NYPD investigations of the

alternate suspects in this case; (2) interviewed of over 60 fact witnesses; (3) reviewed "hundreds

and hundreds" of hours electronic evidence; and (4) reviewed "hundreds of hours" of forensic

testing involving DNA evidence, ballistics evidence and the re-testing of fingerprint evidence.

445.    No evidence connected Mr. Bell to the Murders.

446.    Mr. Bell is in fact innocent and there is overwhelming evidence of Mr. Bell's

innocence.

447.    Defendants Pia and Sica acted under pretense and color of state law. Their acts

were beyond the scope of their jurisdiction, without authority of law, and in abuse of their

powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

448.    As a direct and proximate result of the Defendants' actions, Mr. Bell was wrongly

prosecuted, convicted, and imprisoned over twenty-four years and suffered other grievous and

continuing injuries and damages.

**FOURTH CLAIM FOR RELIEF**
42 U.S.C. § 1983 *Monell* Claim for Actions of the Queens County District Attorney's Office
(Against Defendant City of New York)

449.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

450.    Under the principles of municipal liability for federal civil rights violations, the

District Attorney of Queens County (or his authorized delegates) has final authority and is the

City's policymaker in the training, instructing, supervising and disciplining of attorneys.

451.    As set forth above, the District Attorney of Queens County, Richard Brown,

personally and/or through his authorized delegates, at all relevant times had final authority, and

constituted a City policymaker for whom the City is liable with respect to such conduct.

452.    At the time of Mr. Bell's arrest, trial, and conviction, the QDAO had a custom

and practice not to have an effective mechanism for prosecutors to access information known to

others in the prosecutor's office, regardless of whether it was apparent that relevant *Brady* material might be held elsewhere in the office.

453. This custom and practice facilitated *Brady* violations as prosecutors would respond to requests without searching the full range of potentially exculpatory files, would fail to search for or locate potentially exculpatory files, and could claim they had no knowledge of exculpatory information.

454. The ADAs responsible for the prosecution of Mr. Bell acted in accordance with this QDAO practice, policy, and custom when they repeatedly, without fear of reprisal, withheld valuable *Brady* material (and, at times, failed to search and locate exculpatory materials) clearly indicating that someone else had, in fact, committed the murder for which they were seeking the death penalty against Mr. Bell (among other valuable exculpatory evidence), made multiple false statements in open court that no *Brady* material existed, and used this withheld information against Mr. Bell, painting his defense team as "despicable" for having the audacity to try to elicit that someone else had committed the crime.

455. At the time of Mr. Bell's arrest, trial, and conviction, the Queens District Attorney's Office also had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for misconduct, including frequent *Brady* violations.

456. This custom and practice encouraged, condoned and ratified the prosecutors' deliberate and reckless disregard of their constitutional and ethical duties.

457. In the years before and during Mr. Bell's conviction, the Queens County District Attorney's office, under Mr. Brown and his predecessor, John Santucci, had an extensive history of prosecutorial misconduct that caused constitutional violations, including, *inter alia*, *Brady* violations and knowing reliance on false testimony.

458.    Policymakers at the QDAO, acting with deliberate indifference to these constitutional violations, including those that injured Plaintiff, failed to take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish prosecutorial misconduct.

459.    To the contrary, the deliberate indifference and policies and practices of QDAO policymakers, including the District Attorney and his designees, created a culture of prosecutorial misconduct that they knew was highly likely to result in further violations and which, in fact, did so in numerous cases, including Plaintiff's case.

460.    The ADAs responsible for the prosecution of Mr. Bell acted in accordance with these QDAO practices, policies, and customs when they repeatedly, without fear of reprisal, withheld valuable *Brady* material (and, in the case of some ADAs, failed to search for such material) indicating that someone else had committed the murder for which they were seeking the death penalty against Mr. Bell (among other valuable exculpatory evidence), made multiple false statements in open court that no *Brady* material existed, and even used this withheld information against Mr. Bell, painting his defense team as "despicable" for having the audacity to try to elicit that someone else had committed the crime.

461.    The ADAs responsible for the prosecution acted in accordance with these QDAO practices, policies, and customs when they failed to repeatedly represented that there was no *Brady* material available because they were unaware of material contained outside the case files of Plaintiff and his co-defendant.

462.    This QDAO culture, where winning mattered more than following the Constitution, was a proximate cause of the constitutional violations set forth *supra*.

463.     These QDAO policies, practices, and procedures of failing to have an effective mechanism for prosecutors to access information known to others in the prosecutor's office facilitated *Brady* violations, allowed prosecutors to commit prosecutorial misconduct in dozens of cases, without consequence, and made it foreseeable to Defendant City of New York that prosecutors would commit misconduct in Mr. Bell's case, including withholding *Brady* material, falsely claiming no *Brady* material existed and then painting the defense as "despicable" for defending their clients and  trying to hold the prosecution to its constitutional obligations.

464.     These unlawful policies, practices, procedures, and customs of Defendant City were a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

### FIFTH CLAIM FOR RELIEF
Common Law Malicious Prosecution
(Against Defendants Pia, Sica, and the City of New York)

465.     Plaintiff realleges the above paragraphs as if they were fully set forth herein.

466.     Defendants Pia and Sica, despite knowing that probable cause did not exist to arrest and prosecute Mr. Bell for the Murders, and though the grand jury's probable cause determination was vitiated by these defendants' undisclosed misconduct, coerced confession, and fabrication of evidence acted individually and in concert to cause Mr. Bell to be wrongfully arrested and prosecuted for those crimes.

467.     Defendant Pia lacked probable cause to initiate the prosecution of Mr. Bell and the indictment and conviction of Mr. Bell was procured by fraud, perjury and presentation of fabricated evidence.

468.    False and fabricated evidence was given by Defendants Pia and Sica to the prosecutor, the Grand Jury, and the Petit Jury.

469.    Defendants Pia and Sica acted with malice, and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict and prosecute Mr. Bell.

470.    Defendants Pia and Sica prosecuted Mr. Bell regardless of the fact that Defendants knew the only compelling evidence against him was his confession, which they had coerced through physical violence and intimidation.

471.    The proceeding was terminated in Mr. Bell's favor when his conviction was vacated on March 5, 2018 and when the indictment was dismissed on June 4, 2021.

472.    In announcing the decision to seek to dismiss the indictment, the QDAO explained that between March and June of 2021, it had "conducted an extensive and exhaustive investigation" in which it: (1) reviewed all relevant documentary evidence, including both documents related to Mr. Bell's case and the files of numerous other NYPD investigations of the alternate suspects in this case; (2) interviewed of over 60 fact witnesses; (3) reviewed "hundreds and hundreds" of hours electronic evidence; and (4) reviewed "hundreds of hours" of forensic testing involving DNA evidence, ballistics evidence and the re-testing of fingerprint evidence.

473.    No evidence connected Mr. Bell to the Murder.

474.    Mr. Bell is in fact innocent and there is overwhelming evidence of Mr. Bell's innocence.

475.    Defendants Pia and Sica acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

476.    Defendant the City of New York, as employer of Defendants Pia and Sica, is responsible for the officers' wrongdoing under the doctrine of *respondeat superior*.

477.    As a direct and proximate result of the Defendants' actions, Mr. Bell was wrongly prosecuted, convicted, and imprisoned over twenty-four years and suffered the other grievous and continuing injuries and damages as set forth above.

WHEREFORE, GEORGE BELL prays as follows:

A.    That the Court award compensatory damages in the amount of at least $50 million to Plaintiff and against the Defendants the City of New York, Louis Pia, Richard Sica, Paul Heider, Maryanne Bubelnik, Frank Bovino, Andrew Cardamone, Denis Brooks, and William Nevins jointly and severally;

B.    That the Court award punitive damages against the Individual Defendants to be determined by the jury;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C.§ 1988 for all 42 U.S.C. § 1983 claims; and

E.    For any and all other relief to which he may be entitled.

Dated:  New York, N.Y.
        June 2, 2022

Respectfully submitted,

_____/s/ Richard D. Emery_____

Richard D. Emery
Earl S. Ward
Debra L. Greenberger
David Berman
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

SCOTT STEVENSON
Aon Corporation
One Liberty Plaza
33rd Flood
New York, New York 10006
347-276-2299

*Attorneys for Plaintiff George Bell*