UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
                                   :

GEORGE BELL,                     :          **REPORT AND**
                Plaintiff,     :          **RECOMMENDATION**
                                     :

        -against-            :          22-CV-3251 (DG)(PK)
                                     :
                                     :

CITY OF NEW YORK, LOUIS PIA,   :
RICHARD SICA, PAUL HEIDER,    :
FRANK BOVINO, MARYANN      :
BUBELNIK, DENNIS BROOKS,     :
WILLIAM NEVINS, and          :
NANCY CARDAMONE, in her      :
capacity as administratix of the   :
Estate of Andrew Cardamone,   :
                                     :

                Defendants.    :
----------------------------------------------------------- X

**Peggy Kuo, United States Magistrate Judge:**

       Plaintiff George Bell ("Plaintiff" or "Bell") was convicted of murder in the first degree in 1999

and sentenced to life in prison without the possibility of parole. In March 2021, his conviction was

vacated, and the case against him was dismissed. Plaintiff has now brought this action against the City

of New York (the "City") and New York Police Department ("NYPD") Officers Louis Pia ("Pia"),

Richard Sica ("Sica"), Paul Heider ("Heider"), Frank Bovino ("Bovino"), Maryann Bubelnik

("Bubelnik"), Dennis Brooks ("Brooks"), and William Nevins ("Nevins"), and Nancy Cardamone, in

her capacity as administratrix of the Estate of Officer Andrew Cardamone ("Cardamone")

(collectively, "Individual Defendants," and together with the City, "Defendants"), alleging violations

of 42 U.S.C. § 1983 and New York state common law relating to his wrongful conviction. (*See* Am.

Compl., Dkt. 52.)

Defendants have filed a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), requesting dismissal of the federal and state malicious prosecutions claims (in the Third and Fifth Claims) against Defendants Pia and Sica, the federal fair trial claims (in the Second Claim) against Defendants Nevins and Heider, and the municipal liability claims against Defendant City of New York (the Fourth Claim). ("Motion," Dkt. 70; Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs. Mem."), Dkt. 72.)

The Honorable Diane Gujarati referred the Motion to me for a report and recommendation. For the reasons stated herein, I respectfully recommend that the Motion be denied.

## BACKGROUND

The following facts are taken from the Amended Complaint (Am. Compl., Dkt. 52) and assumed to be true for purposes of the Motion.

### I.      The Murders and Plaintiff's Arrest

On December 21, 1996, on Astoria Boulevard in Queens, Mike Epstein, the owner of a check-cashing store, and Charles Davis, an off-duty NYPD officer working as his security guard, were shot and killed in a failed robbery attempt at the store (the "Murders"). (Am. Compl. ¶ 42.)

Then-Mayor Rudolph Giuliani and top law enforcement officials "began exerting intense pressure" to solve the crime before Christmas, and the NYPD started a massive effort to identify and arrest the perpetrators. (*Id.* ¶¶ 43-44.) Initial attention focused on a local gang who had been involved in similar armed robberies in the area. (*Id.* ¶ 45.) The police placed wanted signs around the neighborhood stating that the suspects "were involved in a past robbery at a check cashing business in [Queens]" and describing the suspects as "three black men ranging from 5'11" and 6'3" in height and weighing 180, 185 and 190 pounds, respectively." (*Id.* ¶ 47.) The NYPD issued an "all points bulletin" which identified the wanted men as "suspects in a robbery of another check cashing store nearby" and stated that "two of the above individuals may be connected to the murder of the police

officer on 12/21/96 in 115PCT" ("All Points Bulletin").  (*Id.* ¶ 49.)  The *New York Daily News* reported that investigators believed that the suspects were members of a local gang that had committed other armed robberies in the area, including two armed robberies of check cashing businesses, one of which occurred two days before the Murders.  (*Id.* ¶¶ 45-46.)

On December 23, 1996, the NYPD arrested John Mark Bigweh ("Bigweh") for selling marijuana.  (*Id.* ¶ 53.)  Bigweh, who was on probation for robbery and assault charges, was interrogated over the next two days.  (*Id.* ¶¶ 54, 56.)  He initially told the police that he had been partying with Bell and Gary Johnson ("Johnson") on December 20 and 21, and they later approached him on the street about going with them to commit a robbery, along with a person named "Zebedia," but Bigweh declined to go with them.  (*Id.* ¶ 59.)  NYPD Detective Michael Falciano then drove Bigweh around in a van for six hours, after which Bigweh provided a second statement, admitting that he participated in the robbery with Bell, Johnson, a person named "Roti," and a driver named "Jason."  (*Id.* ¶¶ 60-61.)  He identified Bell as the shooter.  (*Id.* ¶ 56.)

On the basis of Bigweh's statement, NYPD officers instructed Bigweh to call Bell (and Johnson, as discussed below) and inform him that Bell's friend Mendez Collier had been arrested and was at the station.  (*Id.* ¶ 65.)  Bell, who was sick at home and had just taken Nyquil, left his home shortly after midnight on December 25 and went to the station.  (*Id.* ¶ 66.)

Bell did not match the description of the suspects the police had previously described.  He was 19 years old, had no criminal record, had "limited mental capacity," and worked as a stock boy at Old Navy.  (*Id.* ¶¶ 36-38.)

Upon arrival at the 115th Precinct, Bell was arrested and transported to the 109th Precinct for interrogation.  (*Id.* ¶ 67-68.)  When Bell's mother later came to look for him at the 115th Precinct, she was informed that the police did not know of his whereabouts.  (*Id.* ¶ 69.)

At the 109th Precinct, Bell was handcuffed to a chair and told that he was "in big trouble." *(Id.* ¶ 77.) After waiting there, he was brought to an interrogation room with Pia and Sica. *(Id.* ¶ 78.) The two detectives did not read Bell his *Miranda* rights, but instead asked him to sign a paper waiving his rights. Then they accused him of being involved in the Murders and interrogated him about his role in them. *(Id.* ¶¶ 80-82.)

Bell maintained that he was not involved in the Murders and did not know what the officers were talking about. *(Id.* ¶¶ 83-87.) In response to his denials, the interrogation became violent: Pia pressed a hockey stick against Bell's neck and told him he could "use [his] head as a hockey puck," "yanked" Bell by his braids, tearing hair from his scalp, repeatedly knocked him to the floor, and told Bell he would "put him in the fucking hospital" unless Bell told him what he needed to know. *(Id.* ¶¶ 88-93.) Sica sat nearby, did not intervene, and encouraged Bell to comply with Pia's demands. *(Id.* ¶¶ 94-96.) When Bell asked if what he was experiencing was police brutality, Sica responded "No, this is how we get things done." *(Id.* ¶¶ 97-98.) Pia and Sica "screamed" at Plaintiff that he would never see his family again and that he would "get the electric chair" unless he confessed to the Murders. *(Id.* ¶¶ 99-100.) During the interrogation, Bell asked to call his mother and an attorney but was told by Pia that "cop killers don't get attorneys." *(Id.* ¶ 101.) Bell was terrified and "began repeating facts that Detective Pia [who had read Bigweh's statement]…fed to him," telling Pia "'what he wanted to know' to make the abuse and threats stop." *(Id.* ¶¶ 102-03.)

Approximately nine and a half hours after his arrest, Bell signed a statement, which he did not read, written by Pia, that implicated him in the Murders. *(Id.* ¶ 104.) After being allowed to sleep in a holding cell for three hours, Bell was brought back to the interrogation room around 12:22 p.m., where he was asked to repeat his false confession on video to Assistant District Attorney ("ADA") Peter Reese ("Reese") while Pia and Sica were also in the room. *(Id.* ¶¶ 108-111.) In the video, Bell repeated his confession, stated that he was "being framed," and, after describing his involvement,

asked Pia if he "did good." (*Id.* ¶¶ 113-16.) Reese told Bell that he was going to show him a photo of an individual to identify, to which Bell responded, "I know, you showed me." (*Id.* ¶ 117.) Bell asked if he could speak to Reese alone, but his request was denied. (*Id.* ¶ 118-19.)

Plaintiff alleges that after his interrogation and confession, Pia and Sica realized that they had coerced him into implicating Mendez Collier in the crime, who they did not believe was involved. In order to correct the error, Sica created a falsified "DD5" report, in which he stated that after the confession, Pia and Sica had a "brief conversation" with Bell in his cell, and that Bell said he falsely accused Mendez Collier because Bigweh was close to "Roti" and Bell "was afraid that he would be hurt in jail" if he implicated Bigweh. (*Id.* ¶¶ 121-23.) Bell denies ever saying this. (*Id.* ¶ 124.) Pia and Sica provided Bell's false confession and the fabricated DD5 to prosecutors and, in turn, the grand jury, which issued an indictment against Bell. (*Id.* ¶¶ 126, 310.)

Gary Johnson was interrogated by Defendants Cardamone and Brooks. (*Id.* ¶ 141-147.) Johnson told them that he had driven to the check-cashing store with someone he did not really know named "Jason" and "two of Jason's friends that [he] didn't know." (*Id.* ¶ 145.) He claimed that Bell was already at the check-cashing store when they arrived. (*Id.* ¶ 146.) Johnson stated that he had passed out after a night of partying, was "still drunk" when he woke up, and that "he did not even remember the crime but had 'seen it on the news' but he 'didn't think [he] was involved in it because [he] woke up and it was just another day for [him].'" (*Id.* ¶¶ 144, 146 (alterations in the original).) Johnson was also arrested and charged with the Murders.

Rohan Bolt, who was identified as the "Roti" in Bigweh and Bell's confessions, was also arrested and charged with the Murders. (*Id.* ¶¶ 135, 298.)

## II.    Additional Investigation into the Murders – Jason Ligon's Statement and Alibi

On May 30, 1997, Jason Ligon ("Ligon") was arrested and, after five hours in custody and interrogation by Defendants Bubelnik and Bovino, he confessed to being involved in the Murders.

(*Id.* ¶ 157.)  He stated that he was the driver, that Bell was the shooter, and that Bolt, now identified as the person whom Bigweh and Bell called "Roti," put the robbery plan together.  (*Id.* ¶¶ 135, 162.)  Bubelnik had been present at Bigweh's confession, and Plaintiff alleges that Bubelnik and Bovino worked closely with Pia and Sica to "feed the same facts" as those given to Bell to coerce a confession.  (*Id.* ¶¶ 158-59.)  Ligon's written and video confessions "mirrored" those given by Bell and provided more detail.  (*Id.* ¶ 164.)

However, Ligon's counsel hired a private investigator who determined that Ligon was in Washington, D.C. at the time of the murders and that he was not involved.  (*Id.* ¶ 165.)  This alibi information was given to the Queens District Attorney's Office ("QDAO"), who confirmed its accuracy. (*Id.* ¶¶ 166-67.)  Ligon later told investigators that police officers gave him alcohol during the interrogation.  He has since recanted his confession and stated that he was not present at the robbery and murders.  (*Id.* ¶¶ 170, 214.)

Plaintiff alleges that the QDAO was aware that Ligon was not involved in the murders and had an alibi, but refused to dismiss the charges against Ligon until after Bell, Bolt, and Johnson were tried.  (Am. Comp. ¶ 171.)  Neither Bell nor his counsel were informed by Bubelnik, Bovino, or the QDAO that Ligon's confession, which implicated Bell, was false.  (*Id.* ¶ 176-77.)

### III.    Investigations into the Speedstick Gang

On May 9, 1997, two off-duty police officers were attacked delivering payroll to a business in Flushing, Queens.  (*Id.* ¶ 200.)  Aaron Boone ("Boone") and Robert Majors ("Majors"), who were associated with the "Speedstick" Gang linked to armed robberies in the area (*id.* ¶ 270), were arrested in connection with the crime.  (*Id.* ¶¶ 200-01.)  The *Daily News* stated that, based on information provided by the NYPD, "'Boone and Majors are suspects in other payroll heists in Queens,'" including the Murders.  (*Id.* ¶¶ 202-03.)  Defendant Heider signed a felony complaint against Boone and Majors on May 10, 1997.  (*Id.* ¶ 204.)

In a DD5 dated May 16, 1997, Heider memorialized an interview of "Witness #1" who provided a detailed account of the activities "'of a Robbery Ring that was run by the Twins Aaron and Ammon Boone.'" ("DD5 288") *(Id.* ¶ 256.)  DD5 288 provided background on the robbery gang's operations and summaries of at least seven armed robberies that the group carried out in 1996 and 1997.  *(Id.* ¶ 257.)  Witness #1 identified Jamal Clark as a member of the robbery gang.  He also stated that he had personally participated with Clark, Boone or Ammon Boone in several of the robberies. *(Id.* ¶ 258.)  Witness #1 gave information that directly implicated this robbery gang in the Murders. As set forth in DD5 288,

> ***[Witness #1] stated that he was told by Jamal Clark that the group robbed a check cashing store on Astoria Blvd. This job was set up by the [Boone] Twins and that Jamal Clark was outside and that something went bad.  They did not get any money.*** Witness #1 stated that this was a phone call and that Jamal Clark was down south at the club with the Twins after this robbery. Jamal told him that he was upset because he was doing a lot of jobs also in NY and down south and that he was not getting a fair share of the money. He was concerned that if he left that the Twins may kill him because they felt that he knew to[o] much and could tell the police. Jamal told him he was leaving and he did.
>
> \*Witness #1 stated that Jamal Clark had a code name for all the robberies that he participated in with the group. The name is JASON.

*(Id.* ¶ 260 (alterations and emphasis in original).)   Witness #1 also stated that another gang member told him that Boone later shot Clark in the back of the head.  *(Id.* ¶ 262.)

Jamal Clark had been killed in March 1997, and a DD5 dated March 28, 1997 shows that information regarding Clark's murder was given to Pia and Sica ("DD5 63").  *(Id.* ¶ 277.)  Boone was indicted for Clark's murder in January 1999. *(Id.* ¶ 264.)

DD5 288 and several other DD5s related to the NYPD's investigation of Speedstick were turned over to the QDAO.  *(Id.* ¶ 272.)  Detective Stacey Calantjis, one of the "lead detectives" working on the Speedstick investigation, also stated that he and other Speedstick investigators had

shared "everything" they learned about Speedstick with Pia, Sica, and Defendant Nevins, who was Pia and Sica's boss.  (*Id.* ¶¶ 280-82.)

In notes taken in 1997, in a folder labelled "Speedstick," the QDAO's lead trial counsel at Bell's trial, ADA Charles Testagrossa ("Testagrossa"), recorded that he was informed that Heider "'[b]elieve[d] Jamal was driver in Davis homicide [the homicide for which Mr. Bell was convicted]'; 'Jason was Jamal'; and 'Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark "Jason."'" (*Id.* ¶¶ 226-27 (alterations in original).)

## IV.  Bell's Trial and Conviction

### A.  *Requests for* Brady *Material*

Prior to and during Bell's criminal trial in 1999, Bell's counsel sought exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  On March 25, 1997, Bell's counsel demanded production of *Brady* material, pointing specifically to media coverage of the gang that was robbing check cashing stores prior to Mr. Bell's arrest.  (Am. Compl. ¶¶ 196-97.)  On April 7, 1997, ADA Neal Morse responded that the QDAO was "'not in possession of, or aware of, any *Brady* material.'"  (*Id.* ¶ 198.)

On October 1997, Bell's counsel filed a motion to compel *Brady* material, expanding the request to include information about Boone and Majors as suspects in the Murders and information about Ligon.  (Am. Compl. ¶¶ 206-07.)  The QDAO again represented that there was no *Brady* material, specifically stating, "'[T]here is no evidence pointing to any uncharged person as being involved in the crimes charged.'"  (*Id.* ¶ 208.)

On January 19, 1999, Bell's counsel again sought *Brady* material regarding Ligon, and was again told that none existed.  (*Id.* ¶ 210-12.)

## B.  Evidence Presented at Bell's Trial

At Bell's trial in 1999, the QDAO introduced Bell's coerced confession.  The prosecution also offered testimony from Gregory Turnbull and Reginald Gousse.  (*Id.* ¶¶ 239-43.)  Turnbull testified that he saw suspects flee before sunrise about 180 feet away, and refused to provide a sketch because "it could have been anybody."  (*Id.* ¶ 240.)  Gousse, a jailhouse informant who received an "extraordinary favor" from the QDAO of arguing for his immediate release so he would not be detained by immigration authorities, "simply restated information that was already available through public news sources, including repeating errors that been publicly reported."  (*Id.* ¶¶ 245-46.)

## C.  Unsuccessful Attempts to Introduce Evidence Connecting Speedstick to the Murders

Bell's counsel sought to have Defendant Heider testify about his investigation in the Boone and Majors case; however, ADA Testagrossa represented to the court that there was "no connection" between the crimes, and Heider's testimony was precluded.  (*Id.* ¶¶ 216-17.)

During the testimony of Defendant Nevins, Commanding Officer of the Queens Homicide Squad, Bell's counsel asked whether "'[t]here was also a robbery of a check cashing place that occurred in May of 1997,'" and whether "'the people that were arrested were Aaron Boone and Robert [Majors].'"  (*Id.* ¶ 218.)  ADA Testagrossa objected on the basis that there was no connection between the crimes, and the objections were sustained.  (*Id.* ¶¶ 218-19.)  Likewise, when counsel for Bell tried to ask "why guns recovered during the investigation of the armored car robbery in 1997 were tested against ballistics evidence at the check cashing store," the prosecutors "disclaimed knowledge of why these tests were conducted," and called the two cases "'completely different,'" stating that there was "'no connection'" between them.  (*Id.* ¶¶ 220-21.)

Bell's lawyers were also unsuccessful in their attempt to call the NYPD fingerprint expert to testify that he had compared Jamal Clark's prints to those found at the scene of the Murder.  The prosecutor stated that fingerprints taken elsewhere were "'collateral and irrelevant.'"  (*Id.* ¶ 223.)

### D. Bell's Conviction and Subsequent Exoneration

Bell was convicted of murder in the first degree on June 11, 1999, and, on July 27, 1999, he was sentenced to life in prison without the possibility of parole.  *(Id.* ¶¶ 235, 253.)

Bell served more than 24 years in prison.  (*Id.* ¶ 10.)

In March 2021, based on information from Bell's post-conviction attorneys and after investigation by the QDAO's Conviction Integrity Unit ("CIU"), the QDAO asked the state court to vacate Bell's conviction.  *(Id.* ¶¶ 11, 273, 303.)  The court granted the motion.  *See People v. Bell*, 71 Misc. 3d 646 (N.Y. Sup. Ct. 2021).  The QDAO then dismissed all charges against Bell.  (Am. Compl. ¶ 14.)

The exoneration was based in part on the revelation that *Brady* material was not disclosed to Bell prior to his conviction.  Plaintiff states that the most significant undisclosed exculpatory evidence is Heider's DD5 288, dated May 16, 1997, which contained the statement by Witness #1 that Speedstick member Jamal Clark described his own involvement in the robbery of the checking cashing store on Astoria Boulevard that had "gone bad." (*Id.* ¶ 260.)  It was also discovered that DD5 288 and other DD5s related to the NYPD's investigation of Speedstick were turned over to the QDAO but not produced as *Brady* material.  (*Id.* ¶ 272.)

The CIU investigation uncovered additional exculpatory evidence that was not disclosed to Bell, for example: the NYPD All Points Bulletin, which stated that suspects in a nearby robbery of a check cashing store were also suspects in the Murders; a DD5 indicating that days before the Murders, three or four men, including one whose scar and mustache matched that of Jamal Clark's, appeared to be casing Epstein's check cashing store; eyewitness statements and a DD5 that contradicted Bell's confession regarding the color of the getaway car; interviews with two eyewitnesses who described the getaway vehicle as having North or South Carolina license plates, tying the Murders to the Boone twins, who owned a nightclub in South Carolina; and information regarding Bigweh's testimony,

including a DD5 reflecting that Bigweh stated that he was not involved in the Murders, information that Bigweh's cooperation agreement was terminated shortly before Bell's trial, and documents showing that Bigweh had attempted suicide in custody and experienced auditory hallucinations for which he had received psychiatric evaluation.  (*Id.* ¶ 276.)

## V.   Policies and Practices of the QDAO

Plaintiff alleges that the *Brady* violations that occurred in relation to his conviction were not an isolated incident, but part of a pattern and practice of the QDAO to encourage *Brady* violations in order to secure convictions.  *(Id.* ¶ 314.)  The QDAO had a policy and practice of "siloing" information across bureaus, making it difficult for prosecutors from different bureaus to access and share information, and giving "plausible deniability" to prosecutors who did not search beyond their own bureaus for exculpatory materials.  (*Id.* ¶ 318.)  The office also did not provide any training to prosecutors on how to locate *Brady* material known to other prosecutors in the office.  (*Id.* ¶¶ 325, 348.)  In Plaintiff's case, the QDAO confirmed during its post-conviction investigation that "significant" *Brady* material relating to the Speedstick Gang was not located in the files of Bell, Bolt, or Johnson, but rather, all Speedstick material was stored in a separate bureau.  (*Id.* ¶¶ 328-31.)

ADA Testagrossa stated that the failure to produce *Brady* material was a "'law office failure' that occurred as a result of 'silo procedures engaged in by the [QDAO] during the late 1990s.'"  *(Id.* ¶ 335.)  ADA Brad Leventhal, another prosecutor in the case against Bell, stated that the failure to produce *Brady* material "'was the result of the [QDAO's] architecture during the last millennium, which created an environment in which significant possibilities for the failure to share critical information existed.'"  (*Id.* ¶ 343.)  Plaintiff alleges that during the period before Bell's arrest, New York state courts reversed "numerous convictions as a result of the QDAO's failure to comply with *Brady.*"  (*Id.* ¶ 360.)

In addition to not training prosecutors on their *Brady* obligations, Plaintiff alleges that the QDAO failed to investigate or discipline violations of those obligations. (*Id.* ¶ 365.) Prior to and during Bell's prosecution, the QDAO "had an extensive history of prosecutorial misconduct that caused constitutional violations," including *Brady* violations, "and the failure to correct the same." (*Id.* ¶ 369.) In 1996, the QDAO compiled a Prosecutorial Misconduct Survey ("Survey"), which identified at least 39 cases where an appellate court found, or the QDAO admitted, that the QDAO committed misconduct, including *Brady* violations. (*Id.* ¶¶ 372-73.) Plaintiff alleges that this represents "just a fraction" of all instances of misconduct committed by the QDAO between 1988-1995 and identifies an additional 19 judicial decisions finding misconduct that were not included in the Survey. (*Id.* ¶¶ 374, 386.) Plaintiff alleges that, despite this knowledge of documented misconduct, QDAO leadership did not discipline prosecutors or implement any policies, procedures, evaluations, or other changes to avoid committing *Brady* violations. (*Id.* ¶¶ 376-84, 393.)

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, Plaintiff's allegations must be supported by "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts "all factual allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." *Hayles v. Aspen Properties Grp., LLC*, 782 F. App'x 3, 5 (2d Cir. 2019). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "A complaint is properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Hayles*, 782 F. App'x. at 5 (quoting *Twombly*, 550 U.S. at 558).

## DISCUSSION

### I. Malicious Prosecution Claims Against Pia and Sica

Plaintiff alleges that Defendants Pia and Sica engaged in malicious prosecution when they coerced Plaintiff's confession to crimes he did not commit and gave that coerced confession to prosecutors, the grand jury and trial jury, causing Bell to be wrongfully prosecuted for those crimes. (Am. Compl. ¶¶ 466-77, 495-507.) The Third Claim asserts a federal claim under 42 U.S.C. § 1983, and the Fifth Claim asserts a claim under state common law.

The elements of federal and state law malicious prosecution claims are "substantially the same." *Boyd v. City of New York.*, 336 F.3d 72, 75 (2d Cir. 2003). To demonstrate a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment" and "prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (quotations omitted).[1]

Defendants argue that the malicious prosecution claims fail on three grounds: first, that Pia is entitled to absolute immunity based on his testimony to the grand jury; second, that Plaintiff has not plausibly alleged how conduct by Pia and Sica overcomes the presumption of probable cause created by the grand jury indictment; and third, that Plaintiff does not plausibly allege that Sica initiated or continued criminal proceedings against him. (Defendants' Memorandum of Law in Further Support of Motion to Dismiss ("Defs. Reply") at 1, Dkt. 78.)

---

[1] "In addition, under Section 1983, the plaintiff must further demonstrate 'a post-arraignment deprivation of liberty that rises to the level of a constitutional violation.'" *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 370 (E.D.N.Y. 2021) (quoting *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015)). The parties do not dispute that Plaintiff experienced a deprivation of liberty.

### A.  Absolute Immunity for Grand Jury Witnesses

Grand jury witnesses are entitled to absolute immunity for their testimony before a grand jury. *Rehberg v. Paulk*, 566 U.S. 366, 367 (2012); *see also Matthews v. City of New York*, 889 F. Supp. 2d 418, 439-440 (E.D.N.Y. 2012) (dismissing plaintiff's malicious prosecution claim "insofar as it is based on the Individual Defendants' grand jury testimony and pretrial hearing testimony.").  "*Rehberg*, however, does not justify absolute immunity where liability is based not 'on the witness' testimony,' but on other conduct 'laying the groundwork for an indictment'—where the perjury 'was but one additional step' taken to push the case forward."  *Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 244 (E.D.N.Y. 2013), *aff'd in part, appeal dismissed in part sub nom. Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) (quoting *Sankar v. City of New York*, No. 07-CV-4726 (RJD)(SMG), 2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012)).

Defendants argue that Pia, who testified in the grand jury proceeding in Bell's case, is entitled to absolute immunity for his testimony pursuant to *Rehberg*.  (Defs. Mem. at 5.)  Defendants state that "Det. Pia's Grand Jury testimony reflects that his testimony was limited to an inculpatory statement that plaintiff made and which Det. Pia recorded.  As that was the entirety of Det. Pia's involvement in the Grand Jury proceedings, he is entitled to absolute immunity under *Rehberg* for such testimony." (*Id.* at 6.)

Defendants' argument is misplaced.  Plaintiff's malicious prosecution claim against Pia rests not on Pia's testimony to the grand jury, but on his conduct "'prior to' and 'independent of' grand jury testimony."  (Plaintiff's Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss ("Pl. Mem.") at 11, Dkt. 75 (quoting *Coggins v. Buonora*, 776 F.3d at 113).)  Specifically, Plaintiff alleges that Pia (together with Sica) coerced Bell's confession, then forwarded it to the prosecutor. The fact that Pia then testified to the grand jury about that confession does not grant him immunity for his actions in coercing Plaintiff's confession prior to his testimony.  A police officer is not entitled to absolute immunity as a grand jury witness "when a § 1983 plaintiff alleges that the officer withheld

14

and falsified evidence in addition to committing perjury before the grand jury." *Coggins v. Buonora*, 776 F.3d at 112-13.  "When a police officer claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony. If the claim exists independently of the grand jury testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*." *Id.* at 113.  Because Pia's conduct in coercing the confession (separate from his grand jury testimony) laid the groundwork for the indictment, Plaintiff is capable of making out the elements of his malicious prosecution claim without reference to Pia's grand jury testimony.[2]

Accordingly, Pia is not entitled to absolute immunity with regard to the malicious prosecution claim against him.

### B.  Probable Cause

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  "'[I]ndictment by a grand jury creates a presumption of probable cause.'" *Manganiello*, 612 F.3d at 161-162 (quoting *Savino*, 331 F.3d at 72).

"If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983).  "A plaintiff may demonstrate fraud or perjury through 'evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or

---

[2]  Because the alleged unlawful conduct occurred prior to Pia's testimony to the grand jury—and Defendants described the testimony as consisting only of Plaintiff's confession (Defs. Mem. at 6)—I find it unnecessary to consider the transcript containing the contents of his testimony, portions of which Defendants filed under seal. (*See* Declaration of Mark D. Zuckerman, Dkt. 71; Ex. A to the Declaration of Mark D. Zuckerman, Dkt. 74.)

otherwise acted in bad faith.'" *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (quoting *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)).  "[A] police officer may not reasonably rely on a known coerced confession as lawful grounds for probable cause." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  Allegations that police officers coerced a false confession or withheld exculpatory evidence are sufficient to overcome a presumption of probable cause.  *Rodriguez v. City of New York*, 590 F. Supp. 3d 518, 539 (E.D.N.Y.), *amended on reconsideration in part*, 607 F. Supp. 3d 285 (E.D.N.Y. 2022).

Defendants argue that Plaintiff has not overcome the presumption of probable cause created by his indictment because his allegations are "vague, conclusory, and speculative."  (Defs. Reply at 3.) They also contend that in order to state a claim for malicious prosecution, Plaintiff must "establish what occurred in the grand jury," but that he has failed to do so.  (Defs. Mem. at 4 (quoting *Rothstein*, 373 F.3d at 284).)

I find that Plaintiff has sufficiently alleged facts that overcome the presumption of probable cause created by the indictment.  Plaintiff describes in detail how Pia and Sica coerced his confession, that they knew his confession was false, and that they provided this falsified information to prosecutors for use in indicting and prosecuting Plaintiff.  Plaintiff alleges that Pia and Sica could not reasonably rely upon a confession they knew to be coerced or false to establish probable cause. Moreover, despite Defendants' assertions, Plaintiff is not required "to prove what happened before the grand jury to negate probable cause" when he bases his malicious prosecution claims on what occurred outside—not inside—the grand jury proceedings.  (*See* Defs. Mem. at 4 (quoting *Frederick v. New York City*, No. 11 CIV. 469 (JPO), 2012 WL 4947806, at *9 (S.D.N.Y. Oct. 11, 2012) (grand jury minutes ordered to be produced for court's *in camera* review in order to determine whether there was a "particularized need" justifying unsealing) and citing *Rothstein*, 373 F.3d at 283 (malicious prosecution claim dismissed where plaintiff failed "even to attempt to make [a] showing" of "fraud, perjury,

suppression of evidence or other misconduct in the grand jury" when plaintiff alleged only that defendant made false and malicious report to law enforcement).)[3]

## C. Initiation or Continuation of a Criminal Proceeding Against Plaintiff

"A jury may permissibly find that a defendant initiated a prosecution where he 'fil[ed] the charges' or 'prepar[ed an] alleged false confession and forward[ed] it to prosecutors.'" *Manganiello*, 612 at 163 (2d Cir. 2010) (quoting *Ricciuti*, 124 F.3d at 130). "With respect to Section 1983 malicious prosecution claims, district courts in this circuit have 'held that a jury could find an officer liable despite the fact that he did not bring the formal charges or fill out a complaining affidavit, [because] that officer reported the evidence to the complaining officer.'" *Rodriguez*, 590 F. Supp. at 535 (quoting *Bryant v. Crowe*, 697 F. Supp. 2d 482, 492-93 (S.D.N.Y. 2010)). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, ... the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Matthews*, 889 F. Supp. 2d at 440 (quoting *Ricciuti*, 124 F.3d at 130). "[T]here is no requirement that an officer have direct contact with the prosecutor." *Maldonado v. City of New York*, No. 11-CIV-3514 (RA), 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014).

Defendants argue that Plaintiff fails to allege that Sica played an "active role" in the prosecution because he did not "initiate" or "continue" proceedings against Bell, pointing out that Pia, not Sica, signed the criminal complaint against Plaintiff. (Defs. Mem. at 6; Defs. Reply at 4; *see* Am. Compl ¶ 468.)

Plaintiff was not required to allege that Sica brought formal charges against Plaintiff in order to plead that Sica initiated or continued proceedings against him. Plaintiff alleges that Sica participated in coercing Plaintiff's confession, fabricated and signed a DD5 stating that Bell said he had falsely

---

[3] In any event, Defendants confirm that Bell's "inculpatory statement" was presented to the grand jury through Pia's testimony (Defs. Mem. at 6), thus establishing that the statement Pia and Sica are alleged to have coerced was used as part of the grand jury proceedings.

accused Mendez Collier, and provided both the false confession and fabricated DD5 to prosecutors. (Am Compl. ¶¶ 121-23, 126; Pl. Mem. at 13.)  Plaintiff was not required, as Defendants contend, to allege that the DD5 was presented to the grand jury (Defs. Reply at 4), only that Sica provided the falsified document to prosecutors.  *See Boley v. Durets*, No. 12-CV-4090 (ARR)(JO), 2013 WL 6562445, at *6 (E.D.N.Y. Dec. 10, 2013) (finding that "defendant police officers initiated the proceeding by knowingly forwarding false evidence to prosecutors.").

Accordingly, I find that Plaintiff has sufficiently pled malicious prosecution claims against Defendants Pia and Sica.

## II.    Fair Trial Claims Against Defendants Nevins and Heider

Plaintiff alleges that Nevins and Heider deprived him of his right to a fair trial by failing to disclose exculpatory information to him or to prosecutors.  (Am. Compl. ¶¶ 452-465; Pl. Mem. at 14.) Specifically, Plaintiff alleges that Heider deliberately chose not to disclose *Brady* evidence and affirmatively misled prosecutors by representing that his investigation into the Speedstick Gang had no relation to the Murders, and that Nevins possessed information about the Speedstick Gang's involvement in the Murders that he did not provide to prosecutors.  (Am. Compl. ¶¶ 282, 452-465.)

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights."  *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)).  "A fair trial claim may. . .arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant. Th[is] theory of liability is essentially a civil claim seeking damages for a *Brady* violation."[4]  *Id.* at 118 (citing *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015)).

---

[4] A police officer also "denies a defendant a fair trial when she creates 'false information likely to influence a jury's decision and forwards that information to prosecutors,'" *Fappiano v. City of New York*, 640 F. App'x at 118 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d at 130), but Plaintiff does not allege that Heider or Nevins fabricated any evidence.  (*See* Pl. Mem. at 15.)

A violation of *Brady v. Maryland*, 373 U.S. 83 (1963) has three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the evidentiary suppression undermines confidence in the outcomes of the trial." *Id.* at 118 (quotation omitted). "The Second Circuit has 'suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional.'" *Fraser v. City of New York*, No. 20-CV-04926 (CM), 2021 WL 1338795, *5 (S.D.N.Y. Apr. 9, 2021) (quoting *Bellamy v. City of New York*, 914 F. 3d 727, 751 n.23 (2d Cir. 2019)).

## A. *Nevins*

Defendants argue that Plaintiff improperly alleges a theory of supervisory liability against Nevins, that there is no denial of fair trial claim based on a police officer's failure to conduct an adequate investigation, and that Plaintiff has not plausibly alleged that Nevins suppressed evidence. (Defs. Mem. at 7-8; Defs. Reply at 5-6.) Defendants contend that the allegation that Nevins withheld exculpatory information about the connection between the investigation into the Speedstick Gang and the Murders is "completely conclusory and speculative" because Plaintiff "in no way specifies exactly what information he is referring to or that Lt. Nevins was the NYPD officer investigating this case who had the responsibility for interacting with the [QDAO] prosecutors regarding such information." (Defs. Mem. at 8.)

Plaintiff's claim against Nevins is not premised on a theory of supervisory liability but is based on his individual actions in failing to turn over *Brady* material to the prosecutors. (Pl. Mem. at 16.) Plaintiff alleges that Nevins, who was the Commanding Officer of the Queens Homicide Squad, possessed information about the Speedstick Gang's involvement in the Murders because Det.

Calantjis, one of the lead detectives in the Speedstick investigation, "provided all of the information he had" to Pia, Sica and Nevins.  (Am. Compl. ¶¶ 218, 280-81.)  Plaintiff may seek to hold Nevins liable for his personal involvement in actually possessing *Brady* material and failing to turn it over to prosecutors.  *See Jackson*, 552 F. Supp. 3d at 376-77 (noting that there is no special test for supervisory liability under Section 1983 and permitting claims against supervisory officer to proceed where plaintiff pleaded "direct participation in certain constitutional violations.").

Likewise, Plaintiff does not assert that Nevins is liable under Section 1983 for failure to conduct an adequate investigation by not pursuing leads regarding Speedstick's involvement in the Murders.  Rather, Plaintiff's allegations against Nevins rest on his failure to turn over potentially exculpatory information in his possession to prosecutors.

The information from the Speedstick investigation would have included material showing the possible involvement of members of Speedstick in the Murders and could have been favorable to Plaintiff.  Nevertheless, when Nevins testified at Plaintiff's trial and was questioned by defense counsel about a robbery committed by Speedstick, ADA Testagrossa objected on the basis that there was no connection between the crimes.  (Pl. Mem. at 15; Am. Compl. ¶¶ 218-19.)  The prosecutors also never produced information about the Speedstick investigation in response to Plaintiff's requests for *Brady* material.  Plaintiff contends that it is reasonable to infer from these facts that either Nevins withheld the Speedstick evidence from the prosecution or, in the alternative, that the prosecutors withheld it from Plaintiff.  (Am. Compl. ¶ 282; Pl. Mem. at 15-16.)[5]

Plaintiff's allegations are plausible.  Drawing all reasonable inferences in favor of Plaintiff, as is required at this stage, it is reasonable to infer that Nevins possessed exculpatory information from

---

[5] Plaintiff is permitted to plead in the alternative, and the pleading is sufficient if either alternative is sufficient.  "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d); *see also Breton v. City of New York*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019).

the Speedstick investigation that he withheld from prosecutors.  *See Ying Li*, 246 F. Supp. 3d at 627 (finding that plaintiff sufficiently pled a *Brady* violation where defendant police officer did not inform the district attorney's office about exculpatory evidence).  Plaintiff does not need to specify what information Nevins had concerning Speedstick, because Det. Calantjis provided "all" the information he had about the Speedstick investigation with Nevins, which would include information about the connection between Speedstick members and the Murders.

Without deciding whether the non-disclosure of exculpatory evidence must be intentional for a fair trial claim based on a violation of *Brady,* I also find that because Nevins withheld information of obvious exculpatory value from prosecutors, it is reasonable to infer that the non-disclosure was intentional.  *See Valentin v. City of Rochester*, No. 11-CV-6238 (CJS), 2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018), *aff'd*, 783 F. App'x 97 (2d Cir. 2019) (stating that a police officer intentionally suppresses exculpatory evidence when he "hides the information, which is known only to the police, from the prosecutor.").

### B.  Heider

Defendants argue that Plaintiff fails to plead any facts supporting the allegation that Heider withheld exculpatory information from prosecutors.  They contend, to the contrary, that Heider created DD5 288 (which he did provide to prosecutors), that Heider cannot be held accountable for notes taken by ADA Testagrossa, and that Testagrossa's notes contain information provided by Heider which Plaintiff does not contend is false.[6]  (Defs. Reply at 6.)

Plaintiff plausibly alleges that Heider possessed and failed to turn over exculpatory material to prosecutors.  As one of the lead detectives investigating Speedstick, Heider was "aware of substantial

---

[6]  Defendants also state that Heider would be entitled to absolute immunity based on testimony given to a grand jury under *Rehberg v. Paulk*, 566 U.S. 366 (2012), without identifying what grand jury testimony they are referring to.  (Pl. Mem. at 9.)  As discussed *supra*, *Rehberg* does not provide absolute immunity for conduct that occurred outside the grand jury, *i.e.*, withholding exculpatory evidence from prosecutors.

evidence" that members of the Speedstick Gang, not Bell, had committed the Murders.  He prepared the DD5 288 containing a witness statement linking Jamal Clark and the Speedstick Gang to the Murders, identifying Clark as using the code name "Jason."  He also signed the felony complaint charging armed robbery against Speedstick members Boone and Majors, who were reported in the news media as being suspects in the Murders.  (Pl. Mem. at 14-15; Am. Compl. ¶¶ 202-204, 260.)

ADA Testagrossa's notes indicate that, at some point in 1997, Heider shared at least some information with the prosecution regarding the Speedstick Gang, including that the driver "Jason" was actually Jamal Clark, and who the "Bosses" of the gang were.  (Am. Compl. ¶¶ 226-27.)

However, when Bell's counsel sought to have Heider testify at Plaintiff's trial, his testimony was precluded based on ADA Testagrossa's representation to the court that there was "no connection" between Heider's Speedstick investigation and the Murders.  *(Id.* ¶¶ 216-17.)  It is plausible, as Plaintiff alleges, that at the time of the trial in 1999, Heider falsely misrepresented to ADA Testagrossa that there was no connection between the Murders and Speedstick, notwithstanding any previous communications.  (*Id.* ¶¶ 228-29.)  It is also plausible that Heider did not share with prosecutors all the information in his possession that was exculpatory as to Bell's guilt.  Finally, it is plausible, given the direct link between the information Heider possessed and the Murders, that Heider's withholding of exculpatory material was intentional.  (*Id.* ¶ 233.)

Plaintiff argues, in the alternative, that ADAs Testagrossa and Leventhal lied to the court, rather than Heider.  (*Id.* ¶¶ 230-32, 234.)  However, as discussed *supra*, Plaintiff is permitted to plead in the alternative at this point, and the pleading is sufficient if any alternative is sufficient to state a claim.  Fed. R. Civ. P. 8(d); *see also Breton*, 404 F. Supp. 3d at 814.

Accordingly, I find that Plaintiff has sufficiently alleged fair trial claims against Defendants Nevins and Heider.

### III.  Municipal Liability

Plaintiff alleges that the City is liable for the deprivation of Plaintiff's constitutional rights under a theory of municipal liability because policies and customs of the QDAO led to *Brady* violations and were a "substantial factor" in Plaintiff's wrongful conviction and imprisonment.  (Am. Compl. ¶¶ 478-94.)

"A municipality may be liable under Section 1983 if a municipal 'policy or custom' causes 'deprivation of rights protected by the Constitution.'"  *Ying Li*, 246 F. Supp. 3d at 636 (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978)).  "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff."  *Moran v. Cnty. of Suffolk*, No. 11-CIV-3704 (PKC)(GRB), 2015 WL 1321685, at *9 (E.D.N.Y. Mar. 24, 2015); *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (formal policy or actions by a municipal official possessing decision-making authority constitute custom or policy); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice constitutes a custom or policy); *Parker v. City of Long Beach*, 563 F. App'x 39, 41 (2d Cir. 2014), *as amended* (Apr. 21, 2014) (failure to train amounting to deliberate indifference constitutes custom or policy).  In addition, a plaintiff must demonstrate "a causal connection between the custom or policy" and the alleged deprivation of rights.  *Cordero v. City of New York*, 282 F. Supp. 3d 549, 563 (E.D.N.Y. 2017).  "The pleading standard for Monell claims is no greater than for any other claim subject to Federal Rule of Civil Procedure 8(a)."  *Newson v. City of New York*, No. 16-CV6-773 (ILG)(JO), 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019).

Plaintiff asserts two theories of municipal liability. He pleads that the QDAO had a policy, custom, or practice of suppressing *Brady* material through its widespread practice of siloing exculpatory information across separate bureaus, and that QDAO policymakers failed to train or discipline ADAs for *Brady* violations, thus exhibiting deliberate indifference to constitutional violations. (Am. Compl. ¶¶ 478-94.)

## A. Persistent and Widespread Practice

A plaintiff can demonstrate that a practice is widespread and persistent by showing "that there is 'a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.'" *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 491 (E.D.N.Y. 2018), *as amended* (June 27, 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). A persistent and widespread policy exists where "a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). When a plaintiff alleges that the actions of subordinate employees give rise to claim, "the unlawful practice must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 491 (quoting *Newton v. City of New York*, 779 F.3d 140, 156 n.18 (2d Cir. 2015)). "Repeated and consistent conduct often indicate city involvement or acquiescence to a deprivation of liberty." *Cordero*, 282 F. Supp. 3d at 564.

"Plaintiffs may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018), and may also "cit[e] to complaints in other cases that contain similar allegations. . .involve factually similar misconduct, [are] contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability." *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021).

Defendants argue that Plaintiff has not provided sufficient evidence that the practice was widespread beyond the cases against Plaintiff, Rohan Bolt and Gary Johnson—the three individuals prosecuted for the Murders—and that any *Brady* violations due to siloing practices may have been negligent but were not a "conscious choice" of the City.  (Defs. Mem. at 13-14; Defs. Reply at 8 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004).)

Plaintiff need not allege that any *Brady* violations or the practices leading to them were the "conscious choice" of the City or QDAO.  To establish the existence of a widespread de facto custom or policy, plaintiff must "plausibly allege a practice so widespread that it may be inferred [that]… policymakers were aware of 'subordinate[s'] unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'"  *Buari*, 530 F. Supp. 3d at 401 (quoting *Amnesty Am.*, 361 F.3d at 126)).  One may infer from a sufficiently widespread practice that policymakers acquiesced in its existence and continuation.  *See Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 491.  Therefore, it is sufficient for Plaintiff to allege that policymakers consciously chose not to take action against the widespread and persistent practice of siloing exculpatory information in order for that practice to constitute a de facto policy; it is not necessary to allege that the practice itself was a conscious choice by the City.

Plaintiff alleges that the QDAO had "office-wide policies and practices that encouraged *Brady* violations as a means of securing convictions."  (Am. Compl. ¶ 314.)  More specifically, Plaintiff alleges that the QDAO deliberately "siloed" information, making it "exceedingly difficult" for prosecutors to share or access information across different bureaus, thereby giving prosecutors "plausible deniability" for failing to search for or produce exculpatory material.  (*Id.* ¶ 318.)  The "prevailing norm at the QDAO was that once an ADA had reviewed documents in his or her own case file or, at most, his or her own bureau of *Brady* material, his or her *Brady* obligations were satisfied."  (*Id.* ¶ 322.)  During Bell's post-conviction investigation, the QDAO stated that "significant" exculpatory information relating to the Speedstick Gang was maintained in the Major Crimes and Career Criminal Bureau, and

not contained in Bell's case file, which was in the Homicide Bureau.  (*Id.* ¶¶ 328-30.)  A prosecutor's *Brady* obligations extend to all material evidence known to that prosecutor, and "[a] prosecutor is presumed to know all information gathered by his office in connection with an investigation of the case" and "'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'"  *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998) and quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Plaintiff offers multiple forms of evidence to substantiate his claim that the siloing practice was widespread and persistent.  The Amended Complaint contains sworn statements from QDAO prosecutors testifying to a widespread siloing practice at the time of Plaintiff's case.  (Am. Compl. ¶¶ 335-350.)  ADA Testagrossa stated that the *Brady* violations in Plaintiff's case were a "'law office failure' that occurred as a result of 'silo procedures engaged in by the [QDAO] during the late 1990s.'"  (*Id.* ¶ 335.)  ADA Leventhal stated that the *Brady* violations were "'the result of the [QDAO's] architecture during the last millennium, which created an environment in which significant possibilities for the failure to share critical information existed.'"  (*Id.* ¶ 343.)

Plaintiff also provides a list of several cases in which appellate courts "reversed numerous convictions as a result of the QDAO's failure to comply with *Brady*," citing to *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993), where the Court of Appeals found that the QDAO "made a 'determined effort' to avoid its *Brady* obligations by 'shield[ing]' the trial ADAs from knowledge of any agreement with a cooperating witness (Am. Compl. ¶ 361); *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992), where the Appellate Division Second Department "chastised the QDAO for an 'inexcusable' failure to produce exculpatory records when [the prosecutors] were 'under court order to do so' and 'had had them in their possession for several months'" (Am. Compl. ¶ 362); *People v. Banch*, 80 N.Y.2d 610, 621 (1992), where the Court of Appeals reversed a conviction due to a failure to produce a witness's prior

26

statement under *People v. Rosario* , 9 N.Y.2d 286 (1961), "noting the QDAO's 'seeming lack of care in discharging their discovery obligation'" (Am. Compl. ¶ 361); *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995), where the court "faulted the QDAO for failing to disclose potential impeachment evidence" (Am. Compl. ¶ 362); *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994), where the conviction was reversed "due to multiple *Rosario* violations" (Am. Compl. ¶ 362); and *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994), where the conviction was reversed "because [the] QDAO failed to disclose potential impeachment evidence."  (Am. Compl. ¶ 362.)

Plaintiff also describes a Prosecutorial Misconduct Survey compiled by the QDAO in 1996 which recorded at least 39 instances of misconduct in the "few years" before Plaintiff's trial and conviction, "including *Brady* and related discovery violations, summation misconduct, improper reliance on false evidence, and prejudicial degradation of criminal defendants."  *(Id.* ¶¶ 371-75.)  While not all of the cases recorded in the Survey and cited by Plaintiff concern prosecutorial misconduct related to *Brady* and *Rosario* violations, many of them do, thus supporting the allegation of a widespread and persistent practice of failing to produce exculpatory information, including impeachment material.

Defendant argues that two of the cases cited by Plaintiff, *Steadman/Blair* and *Baba-Ali,* are not sufficiently similar to Plaintiff's claims because in the former "the [QDAO] purposely shielded the trial attorneys from an agreement with a cooperating witness," while the latter "stands for the unremarkable proposition that prosecutors failed to produce court ordered exculpatory material." (Defs. Reply at 8.)  While *Steadman/Blair* and *Baba-Ali* do not specifically reference the siloing practice described by ADAs Testagrossa and Leventhal (although the shielding of trial attorneys from cooperation agreements has some similarity to siloing), both cases contain findings by appellate courts of *Brady* violations by QDAO prosecutors in adjudicated cases within a few years of Plaintiff's arrest, investigation, and trial.  They, along with several of the other state appellate court cases cited by Plaintiff, are factually similar to Plaintiff's allegations in that they concern failures to produce

exculpatory evidence, were sufficiently contemporaneous, and contained findings in adjudicated cases. *See Buari*, 530 F. Supp. 3d at 398. They, therefore, may be relied upon to support Plaintiff's allegation that the QDAO had a widespread and persistent practice of not discovering and producing *Brady* material.

Therefore, I find that Plaintiff has sufficiently alleged a practice at the QDAO of not complying with *Brady* obligations that is so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon its policymakers. *See Fraser*, 2021 WL 1338795 at *11 ("[D]istrict courts in this Circuit have consistently refused to dismiss Monell claims alleging that a county prosecutor's office has sanctioned an unlawful practice.").

## B. Failure to Train or Supervise

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007). "To establish 'deliberate indifference,' a plaintiff must show that: [1] a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; [2] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and [3] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Id.* (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). Proof that a policymaker failed to respond to repeated complaints of constitutional violations is sufficient to establish deliberate indifference, but not required; a plaintiff need only show that the policymaker's inaction was the result of a "conscious choice" rather than negligence. *Amnesty Am.*, 361 F.3d at 128 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). In addition, "where. . .a city has a training program, a plaintiff must—in addition—'identify a specific deficiency in the city's training program and establish that that deficiency is closely related

to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Wray*, 490 F.3d at 196 (quoting *Amnesty Am.*, 361 F.3d at 129 (internal quotations omitted)).

Defendants argue that Plaintiff fails to state a *Monell* claim for failure to train or supervise because he does not plausibly allege deliberate indifference: Plaintiff alleges neither a pattern of similar complaints regarding the QDAO's alleged siloing practice, nor that any siloing that did occur was a "'conscious choice'" by the City. (Defs. Reply at 8-9.) Defendants also contend that the allegations collected in the 1996 Prosecutorial Misconduct Survey are not sufficiently connected to the facts of Plaintiff's case to make out a pattern of similar conduct and, contrary to Plaintiff's claims, demonstrates that the QDAO did investigate claims of misconduct. (*Id.* at 10.) Finally, Defendants argue that there is no causal connection between any failure to discipline or train and the alleged siloing. (*Id.* at 9.)

Defendants' arguments are unavailing.

In order to show that the City's failure to train or supervise amounts to deliberate indifference to the rights of those with whom its employees interact, it is not necessary to allege that the violative practice itself, *i.e.,* siloing, was a "conscious choice" by the City. It is sufficient to show that a policymaker's *inaction* in responding to repeated complaints of constitutional violations was the result of a "conscious choice" rather than negligence. *Amnesty Am.*, 361 F.3d at 128.

Moreover, Plaintiff is not required to allege a pattern of conduct regarding the QDAO's siloing practice. Plaintiff's allegations about the QDAO's failure to train, supervise, or discipline regarding *Brady* violations are not limited to the practice of siloing. (Pl. Mem. at 23.) He alleges that "[t]he QDAO provided no training to prosecutors on how to locate *Brady* material known to other prosecutors in the office, and had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for misconduct, including frequent *Brady* violations…[in] deliberate and reckless disregard of their constitutional ethical duties." (Am. Compl. ¶¶ 325, 365-66.)

29

Thus, the pattern of similar complaints need not reference the practice of siloing and may include complaints of *Brady* violations more generally, since complaints in individual criminal cases are likely to focus on specific instances of failures to discover and turn over exculpatory material rather than delve into the institutional reasons for such failures.

Plaintiff alleges that District Attorney Richard Brown and Chief Assistant District Attorney Barry Schwartz read and were aware of the appellate decisions finding that *Brady* violations had occurred, were policymakers at the QDAO at the time the Survey was compiled, and "'expressed concern' to each other 'about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.''" (Am. Compl. ¶¶ 378-82.)  Despite this, the QDAO did not implement any training, and did not discipline any prosecutors for misconduct. (*Id.* ¶ 393.)  To the contrary, Plaintiff alleges that prosecutors who engaged in *Brady* violations received positive evaluations for their conduct and were rewarded with bonuses and promotions.  In one example cited by Plaintiff, a prosecutor who failed to disclose *Brady* material and misrepresented that all *Brady* material had been disclosed during a 1990 case—and who was later admonished by the Grievance Committee for the Ninth Judicial District for his conduct—received positive evaluations noting that "[t]his assistant likes to win and fights toward that end" and "is a true warrior in that he never backs down or gets intimidated"; no mention is made of his misconduct.  (*Id.* ¶¶ 397-400.)  In 1995, a conviction by this same prosecutor was overturned because he failed to turn over *Brady* material, yet that same year, he was promoted to Deputy Bureau Chief of the Supreme Court Long Island City Bureau, where he supervised 10-11 prosecutors.  (*Id.* ¶ 406-07.)  The conviction secured by another prosecutor was reversed in 1992 after the court found that she failed to produce *Brady* material and misrepresented that *Brady* material did not exist; after the reversal, that prosecutor was not disciplined, received no additional training, and no note was placed in her evaluation.  (*Id.* ¶ 424-26.)  Instead, the prosecutor was given salary increases and bonuses and promoted to Bureau Chief.  (*Id.* ¶ 427.)

"As the Supreme Court explained in [*Connick v. Thompson*, 563 U.S. 51 (2011)], a 'pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of a failure to train.'" *Bertuglia v. City of New York*, 839 F. Supp. 2d 703 (S.D.N.Y. 2012) (denying a motion to dismiss plaintiff's failure to train claim where plaintiff alleged "the City has a longstanding, de facto policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct and not otherwise training them to avoid misconduct" and pointed to "over fifteen cases where City prosecutors allegedly committed misconduct" and "allege[d] the existence of many more."). As discussed *supra*, Plaintiff has alleged that *Brady* violations were a widespread institutional failure at the QDAO, establishing a pattern of similar conduct by untrained employees.

Plaintiff has adequately alleged deliberate indifference. The City and QDAO knew to a moral certainty that ADAs would be in possession of *Brady* materials because "these are basic facets of an ADA's job." *Bertuglia*, 839 F. Supp. 2d at 738. Plaintiff has alleged that there was a history of *Brady* violations at the QDAO. Despite the QDAO policymakers' awareness of the prevalence and consequences of *Brady* violations, they did not take any action to train, supervise, or discipline prosecutors, and instead rewarded prosecutors who committed *Brady* violations.

The fact that the QDAO compiled the Prosecutorial Misconduct Survey does not, as Defendants argue, demonstrate that it implemented training or discipline as a result. Plaintiff alleges that QDAO policymakers were aware of the Prosecutorial Misconduct Survey, as well as judicial decisions reflecting prosecutorial misconduct including *Brady* violations, yet took no action whatsoever as a result of this knowledge. (Am. Compl. ¶¶ 376, 378-83, 393.)

Plaintiff alleges that the QDAO's failure to train or discipline regarding *Brady* violations led prosecutors to "repeatedly, without fear of reprisal, with[hold] valuable Brady material" in Plaintiff's

31

case. *(Id.* ¶¶ 484-86.)  This is sufficient to allege a causal connection between the alleged failure to train or discipline and Plaintiff's wrongful conviction and incarceration.

I, therefore, find that Plaintiff has adequately stated a *Monell* claim based on the QDAO's failure to train or discipline its employees for *Brady* violations that amounted to deliberate indifference to the constitutional rights of the individuals whom it prosecuted.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Motion be denied.

Any written objections to this Report and Recommendation must be filed within 14 days of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:  Brooklyn, New York
        September 1, 2023